```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                       CASE NO. 21-cr-20242-CMA
 3

 4    UNITED STATES OF AMERICA,          Miami, Florida

 5             Plaintiff,                July 19, 2023

 6        vs.                            2:00 p.m. to 5:02 p.m.

 7    MARK SCOTT GRENON, JONATHAN        Courtroom 13-3
      DAVID GRENON, JORDAN PAUL
 8    GRENON and JOSEPH TIMOTHY          (Pages 1 to 93)
      GRENON,
 9
               Defendants.
10    _____

11                       JURY TRIAL - DAY 2
             BEFORE THE HONORABLE CECILIA M. ALTONAGA,
12               CHIEF UNITED STATES DISTRICT JUDGE

13    APPEARANCES:

14    FOR THE GOVERNMENT:    MICHAEL HOMER, ESQ.
                             JOHN SHIPLEY, ESQ.
15                           Assistant United States Attorneys
                             99 Northeast Fourth Street
16                           Miami, FL  33132-2131
                             (305) 961-9289
17                           (305) 961-9111
                             Michael.homer@usdoj.gov
18                           John.shipley@usdoj.gov

19    FOR DEFENDANT MARK     PRO SE
      SCOTT GRENON:
20
      FOR DEFENDANT          PRO SE
21    JONATHAN DAVID         ASHLEY KAY, ESQ. (Standby Counsel)
      GRENON:                Assistant Federal Public Defender
22                           150 West Flagler Street
                             Miami, FL 33130-1536
23                           (305) 533-4236
                             Ashleydkay@gmail.com
24                           (Not Present)

25
```

```
 1    APPEARANCES CONTINUED:

 2    FOR DEFENDANT          PRO SE
      JORDAN PAUL GRENON:    JOHN WYLIE, ESQ. (Standby Counsel)
 3                           John W. Wylie, P.A.
                             40 Northwest 3rd Street, Ph 1
 4                           Miami, FL 33128-1838
                             (305) 586-1338
 5                           Jww@johnwylielaw.com

 6    FOR DEFENDANT          PRO SE
      JOSEPH TIMOTHY         PAUL DONNELLY, ESQ. (Standby Counsel)
 7    GRENON:                Paul J. Donnelly, P.A.
                             1 Northeast 2nd Avenue, Suite 200
 8                           Miami, FL 33132-2523
                             (305) 757-3331
 9                           Donnellylaw@bellsouth.net

10

11    ALSO PRESENT:          Jose Rivera, Special Agent

12    REPORTED BY:           STEPHANIE A. McCARN, RPR
                             Official Court Reporter
13                           400 North Miami Avenue
                             Thirteenth Floor
14                           Miami, Florida 33128
                             (305) 523-5518
15                           Stephanie_McCarn@flsd.uscourts.gov

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

**WITNESSES**


**WITNESSES FOR THE GOVERNMENT**:                           **Page**

**Author Simone**
   Direct Examination on Qualifications by Mr. Shipley   **5**
   Direct Examination by Mr. Shipley                     **12**




**WITNESSES FOR THE DEFENDANTS**:                           **Page**
                                                            **--**



| **EXHIBITS IN EVIDENCE** | **IDENTIFIED** | **ADMITTED** |
|---|---|---|
| **Plaintiff's Exhibit No.** | **--** | **--** |
| **Defendants' Exhibit No.** | **--** | **--** |




**MISCELLANEOUS**

                                                            **Page**
**Proceedings.......................................**   **4**
**Court's Closing Instructions.....................**   **45**
**Closing Argument on behalf of the Government......**  **64**
**Verdict..........................................**   **87**
**Court Reporter's Certificate.....................**   **93**

Proceedings
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1              (The following proceedings were held at 2:00 p.m.)

 2                   THE COURTROOM DEPUTY:  All rise.

 3                   THE COURT:  Good afternoon.  Are we ready for the

 4       jury?

 5                   MR. HOMER:  Yes, Your Honor.

 6                   THE COURT:  Let's bring the jury in, please.

 7                   Mr. Wylie, welcome back --

 8                   MR. WYLIE:  Thank you, Judge.

 9                   THE COURT:  -- from your travels.

10                   MR. WYLIE:  My apologies to the Court.  It was a bad

11       situation where I was stuck in the Atlanta airport.

12            (Pause in proceedings.)

13                   THE COURT:  I am going to have my courtroom deputy

14       give everyone copies of the jury instructions as soon as I have

15       them sort of in final form.  The Defendants are welcome to read

16       them and let me know any objections, and you all as well.

17            (The jury entered the courtroom at 2:01 p.m.)

18                   THE COURT:  Good afternoon, ladies and gentlemen, and

19       welcome back.  And thank you for being punctual and for

20       remembering to come back.  I think some of you may have forgot

21       to have your parking validated; if you could go down to 5th

22       floor and do that.  Everyone please be seated.

23                   Government's next witness?

24                   MR. SHIPLEY:  The United States calls Dr. Arthur

25       Simone.
```

July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1              THE COURT:  Doctor, please raise your right hand.
 2                   (Time 2:02 p.m.)
 3                        AUTHOR SIMONE,
 4     a witness for the Government, testified as follows:
 5              THE WITNESS:  I do.
 6              THE COURT:  Please be seated, and please be sure to
 7     speak into the microphone.
 8              MR. SHIPLEY:  May I proceed, Your Honor?
 9              THE COURT:  You may.
10              MR. SHIPLEY:  Good afternoon, ladies and gentlemen of
11     the jury.
12                      DIRECT EXAMINATION
13                      ON QUALIFICATIONS
14     BY MR. SHIPLEY:
15     Q.  Good afternoon, Dr. Simone.
16     A.  Good afternoon.
17     Q.  Who do you work for?
18     A.  I work for the Food and Drug Administration.
19     Q.  And what is your job?
20     A.  I'm the Senior Medical Advisor in the Office of Unapproved
21     Drugs and Lifelong Compliance.
22              MR. SHIPLEY:  Your Honor, one thing I forgot to
23     mention, there is additional Jencks for this witness that we
24     have available for the Defendants; it's just follow-up reports
25     that he did to the reports that were initially provided to
```

```
 1    them.  So we have those available for the Defense.

 2          THE COURT:  You want to pass them over and to

 3    Mr. Wylie and Mr. Donnelly.

 4          MR. SHIPLEY:  Thank you.

 5          THE COURT:  Thank you.

 6    BY MR. SHIPLEY:

 7    Q.  My fault for interrupting myself, Dr. Simone.

 8        Could you tell the jury again, what's your job?

 9    A.  I'm senior medical advisor.

10    Q.  In a particular office of the FDA?

11    A.  The office of unapproved drugs and labeling compliance.

12    Q.  How long have you been in that job?

13    A.  Seven years now.

14    Q.  Okay.  Where is that office located now?

15    A.  In Silver Spring, Maryland, just outside of

16    Washington, D.C.

17    Q.  Okay.  Can you tell the jury generally, what does your

18    office do?

19    A.  We are charged with making sure that drug products that

20    haven't gone through the official approval process don't get

21    marketed in the United States.  And drugs that have gone

22    through that approval process, if they start -- if the

23    companies that make them start to mislabel them, we make sure

24    they come back into compliance with their labelling.

25    Q.  So is one purpose of your job to ensure that products
```

Case 1:21-cr-20242-CMA  Document 299  Entered on FLSD Docket 01/18/2024  Page 7 of 93
Direct Examination of Cara Fiore - Joseph Diamond
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA
7

 1  intended to cure or treat disease are safe and effective?

 2  A.  Technically, no.  The job of making sure the products are

 3  safe and effective are in the office -- that goes to the office

 4  of new drugs.  My job is to make sure that those that haven't

 5  gone through that process don't make it to market.

 6  Q.  Fair enough.  Do you support compliance and enforcement

 7  actions to remove from the market products that are not safe

 8  and effective?

 9          THE COURT REPORTER:  I'm sorry.  I'm sorry, could you

10  repeat the question?

11          MR. SHIPLEY:  Sure.

12  BY MR. SHIPLEY:

13  Q.  Do you support compliance and enforcement actions to remove

14  from the market those products that are not safe and effective?

15  A.  Yes, we do.

16  Q.  Okay.  Let me ask you about your background and

17  qualifications.  You went to college?

18  A.  I did.

19  Q.  And did you get a degree, and in what?

20  A.  I have a few degrees, but a Bachelor of Science in

21  Engineering Science, the first.

22  Q.  Okay.  Do you also have a medical degree?

23  A.  I do.

24  Q.  And do you also have a master's degree?

25  A.  I have a Master of Science in Bioengineering.

1   Q.   And do you have a Ph.D?

2   A.   I do.

3   Q.   In what field?

4   A.   Bioengineering.

5   Q.   Are you -- are you a doctor?

6   A.   I am.

7   Q.   Okay.  What kind of -- did you practice medicine before you

8   joined the FDA?

9   A.   I did.

10  Q.   What kind of medicine was that?

11  A.   I was an anesthesiologist and did some critical care

12  medicine as well.

13  Q.   Okay.  If anyone on the jury isn't familiar with it, what

14  does an anesthesiologist do?

15  A.   We are the ones that help make it safe and comfortable for

16  patients to undergo surgical procedures.  We put you to sleep,

17  make sure you're safe during surgery and make sure you wake up

18  at the end.

19  Q.   In your career, have you also taught medicine?

20  A.   I have.

21  Q.   What kind of places?

22  A.   University of Pennsylvania, Drexel University.

23  Q.   When did you join the FDA?

24  A.   April of 2002.

25  Q.   Okay.  And what was your position -- your position, excuse

July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1  me, initially with FDA?

2  A.  I was a clinical reviewer in the division that was

3  responsible for approving anesthesia, critical care and

4  addiction drug products.  In addition to the anesthesia and

5  critical care products, I also worked on counterterrorism

6  products.

7  Q.  And you had that job until approximately 2015, correct?

8  A.  Correct.

9  Q.  Let me talk about one part of your current job, reviewing

10  drugs, in particular new drugs.  Is that a responsibility of

11  the FDA?

12  A.  It is.

13  Q.  Are you familiar in your job with the Federal Food Drug and

14  Cosmetic Act?

15  A.  I am.

16  Q.  Okay.  That's also known as the FDCA?

17  A.  Yes.

18  Q.  Okay.  That's a law that was passed by Congress, correct?

19  A.  Correct.

20  Q.  Does the FDA help to enforce that law?

21  A.  Yes, that's -- that's our job.

22  Q.  Okay.  Basically speaking, is that the law that governs the

23  distribution of drugs in the United States?

24  A.  It is.

25  Q.  How do the standards for reviewing the potential for new

Case 1:21-cr-20242-CMA   Document 299   Entered on FLSD Docket 01/18/2024   Page 10 of 93
July 19, 2023                                    10
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1  drugs in the United States compare to those of the rest of the

2  world?

3  A.  We have the highest standards in the world.  It's been

4  recognized for a long time, and there is some effort in other

5  countries, particularly those in the European union, Britain

6  and Canada and Japan to match their standards to ours, so there

7  is an international conference on harmonization that works for

8  that.

9  Q.  Why -- why are standards for the United States that much

10  higher?

11  A.  I'm not sure why they're that much higher, but the Food

12  Drug and Cosmetic Act has been modified over the years because

13  of a lot of safety concerns related to drugs coming up at that

14  time.  So Congress would modify the act, and that would elevate

15  the standards.

16  Q.  Okay.  Are you generally familiar with the origins of the

17  FDA itself?

18  A.  I am.

19  Q.  Okay.  What is the FDA trying to do, and what was it

20  originally intended to do?

21  A.  Back in 1906, there was a lot of problems with foods that

22  were being marketed, and drugs.  For the foods, if you've ever

23  read Upton Sinclair's *The Jungle*, it describes things like

24  rotting meat, dead rodents were all mashed together and sold as

25  ground meat.  On the drug side, there were products that were

1  being marketed that -- for -- treatments for children that

2  contained morphine and alcohol, and the product didn't mention

3  that morphine and alcohol were actually in them.  So a lot of

4  misbranding for products that way.

5      And because of the problems that were rising at the time,

6  Congress passed the Pure Food and Drug Act, which is what gave

7  birth to the Food and Drug Administration.

8  Q.  Is applying the FDCA, the Federal Food Drug and Cosmetic

9  Act, rules and definitions a big part of your job?

10  A.  It is.

11  Q.  In connection with your work, have you published any

12  materials?

13  A.  I have.

14  Q.  Okay.  Have you ever been approved by a court as an expert

15  witness to testify about matters relating to the FDCA and new

16  drugs in particular?

17  A.  I have.

18  Q.  Okay.  And have you, in fact, testified about some of the

19  rules and definitions for new drugs that we will be talking

20  about today?

21  A.  I have.

22      MR. SHIPLEY:  Your Honor, at this time, I would tender

23  Dr. Simone as an expert in the application of the FDCA as it

24  relates to the distrubution of potential new drugs and the

25  misbranding of drugs.

```
 1              THE COURT:  You may proceed.
 2                       DIRECT EXAMINATION
 3   BY MR. SHIPLEY:
 4   Q.   Okay.  Dr. Simone, did you become familiar with Miracle
 5   Mineral Solution, or MMS?
 6   A.   I did.
 7   Q.   And was that in about March of 2020?
 8   A.   It was.
 9   Q.   Okay.  Were you asked to do anything regarding Miracle
10   Mineral Solution, or MMS?
11   A.   I was asked to prepare a memo that addressed multiple
12   issues regarding the product.
13   Q.   What were some of the issues you were asked to address?
14   A.   They asked if this product met the legal definition of Food
15   Drug and Cosmetic Act definition of being a drug, whether this
16   product met the definition for being a new drug and whether it
17   was an unapproved new drug.  And also whether it met the
18   requirements for being a prescription drug.
19   Q.   And did you examine all of those issues?
20   A.   I did.
21   Q.   Okay.  Now, what was happening in March 2020 in public
22   health when you first got this assignment?
23   A.   At the time, the COVID-19 pandemic was just starting to
24   ramp up.  It was spreading across the country, and that was a
25   major issue at the time.
```

1   Q.   Okay.  We have all heard a lot about it, but what exactly

2   is COVID-19?

3   A.   COVID-19 is a virus; it's part of the coronavirus family.

4   But this was a different form of the virus and it was very

5   easily spread, it was contagious and it also tended to be very

6   lethal.  So people, especially the elderly or those who had a

7   lot of physical health issues were more prone to suffer from it

8   and possibly die.

9   Q.   So this is in March 2020.  Was coronavirus or COVID-19, was

10  that a new disease at that time?

11  A.   It was.  The 19 is for 2019 when it first came about, it

12  was recognized.

13  Q.   And are you familiar with the reaction of the medical and

14  scientific community to the emergence of this new disease?

15  A.   I am.

16  Q.   What was it?

17  A.   At the time, there was a lot of concern about the spread of

18  the disease and how to prevent that and then how to treat

19  people that had been exposed to the virus.  There was a lot of

20  death associated with it at the time, and not much good

21  information on how best to go about treating and preventing it.

22  Q.   Did that uncertainty exist in the public as well?

23  A.   Yes.

24  Q.   And at the time, was there a cure for coronavirus,

25  COVID-19?

1    A.   No, there was not.

2    Q.   Okay.  Let me ask you:  What specifically were you asked to

3    do regarding Miracle Mineral Solution, or MMS, and how did you

4    go about this assignment?

5    A.   So there were the four things that I mentioned before, did

6    it meet the definition of new drugs.  So I checked to see what

7    the Food Drug and Cosmetic Act says a definition of the drug

8    is, and then I looked at information provided to me about

9    Miracle Mineral Solution to see if that information met any of

10   the definition.  And then once it did, I looked at what we knew

11   about the product's ingredients and its safety and the diseases

12   it was intended to treat -- excuse me -- to determine whether

13   it met the definition of a prescription drug product.

14   Q.   Were you provided certain materials as part of your

15   assignment in your review?

16   A.   I was.

17   Q.   Okay.  What, generally, were those materials?

18   A.   Some of it was the actual product itself, the container

19   that had the Miracle Mineral Solution in it, some of it

20   included the box that that bottle came in and some of it was

21   marketing information and just description about it that was on

22   the Internet.

23   Q.   Okay.  And among those materials, did you receive pages or

24   screen shots from websites and web pages about MMS?

25   A.   I did.

1   Q.   So in your review, did you have to first decide whether

2   Miracle Mineral Solution, or MMS, was a drug?

3   A.   I did.

4   Q.   Okay.   Can you summarize for the jury, what is a drug under

5   the FDCA?

6   A.   There are four things that make a drug a drug under the

7   Food Drug and Cosmetic Act.   The first one is whether it's

8   listed in a pharmacopeia.   You may have heard the letters USP

9   or seen them on products that you buy in the store.   Those are

10  just listings of drugs.

11       The second and third are more practical.   The second one is

12  any article intended for treatment, diagnosis, cure, prevention

13  or mitigation of disease in man and animal; we call that the,

14  quote, disease claim, end quote.   And then the third one is any

15  article other than food intended to affect the structure or

16  function in the body of man or animals.   And the fourth one is

17  any article that's used to provide or make one of the above

18  mentioned articles.

19  Q.   Okay.   When we talk about whether a product is intended to

20  treat diseases of man, do we mean intended by the manufacturer

21  or who?   Who are we talking about?

22  A.   Whoever is -- whatever -- it's an individual, a group of

23  individuals or a company, whoever it is that's actually

24  marketing the product is responsible for the claims.

25  Q.   Does it matter what that person who is marketing or making

1  the product calls it?  Does it matter whether they call it a

2  drug?

3  A.  I'm sorry?

4  Q.  Does it matter whether the person who is making or

5  manufacturing the item calls it a drug themselves?

6  A.  It does not.

7  Q.  Okay.  So if I were making a product and I did not call it

8  a drug, does that have significance to your analysis?

9  A.  No, it does not.

10 Q.  If I called it a sacrament, does that matter to your

11 analysis?

12 A.  It does not.

13 Q.  So how did you determine what the makers of Miracle Mineral

14 Solution intended to do?

15 A.  I looked at the product's label and labelling, there's a

16 difference.  The label is actually what's attached to the

17 bottle that contains the product.  Labelling is anything else,

18 including the label, that describes the use of the product.  So

19 the box that it contains, advertising on television, in

20 magazines, on the Internet, things like that that describe it.

21     So some of that information is generally, in my job,

22 captured for me by someone else and presented to me and then

23 say, is this a drug.

24 Q.  And the materials you reviewed, they included things that

25 you mentioned earlier, the screen shots of websites and other

1    promotional material for this product?

2    A.  It did, yes.

3    Q.  Based upon your review, did you learn whether MMS was

4    intended to cure, mitigate, treat or prevent any diseases of

5    man?

6    A.  I did.

7    Q.  And what did you determine?

8    A.  There were multiple claims made to that effect.  It listed

9    diseases such as Ebola, autism, COVID-19, Alzheimer's and then

10   there was a claim that it kills almost all diseases.

11   Q.  So based upon your -- your review, you determined that

12   there were claims made to treat not just one disease but many?

13   A.  Correct.

14   Q.  For example, did you determine whether MMS was intended to

15   cure, mitigate, treat or prevent cancer?

16   A.  I did determine that, and I saw information to that effect

17   in those screen captures.

18   Q.  Let me ask you:  By the way, in the medical and scientific

19   community, is there one cure for all cancer?

20   A.  There is not.

21   Q.  Is there a cure for cancer at all?

22   A.  There are some treatments that can cure cancer, yes.

23   Q.  Other diseases in what -- were there other diseases in what

24   you reviewed that MMS was intended to cure, mitigate, treat or

25   prevent?

1       For example, was Alzheimer's disease one of those diseases

2   that you saw in the materials you reviewed?

3   A.   It was.

4   Q.   All right.   Is there a cure for Alzheimer's disease

5   recognized by the medical and scientific community?

6   A.   Not at present.

7   Q.   Okay.   How about HIV or AIDS as it may more commonly be

8   known, was that one of the diseases that there was a claim made

9   to cure, treat or prevent?

10  A.   There was a claim regarding that, yes.

11  Q.   How about diabetes?

12  A.   There was.

13  Q.   Parkinson's disease?

14  A.   There was.

15  Q.   Did you also see references to Miracle Mineral Solution, or

16  MMS, curing or treating autism?

17  A.   I did see that.

18  Q.   Okay.   Let me ask you:   With regard to serious diseases

19  like these, we can talk about cancer, is early intervention

20  with proper care especially important?

21  A.   It is.   Some of these diseases, the sooner you start

22  treatment, the more likely you are to have a cure or a good

23  outcome; and the longer you wait, the less likely you are to do

24  that.   And when I say treatment, I mean a number of things.   So

25  for example -- excuse me -- for cancer, it can be medication,

Case 1:21-cr-20242-CMA   Document 299   Entered on FLSD Docket 01/18/2024   Page 19 of 93
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA
19

1    it can be radiation, it can be surgery, it can be therapy.

2        So there's a number of different treatments, and knowing

3    when to institute which treatment and which sequence to follow

4    them in is very important to getting the best result for the

5    patient.

6    Q.  So for a disease like cancer and those serious diseases, is

7    it especially harmful if someone is taking a product that is

8    not safe and effective instead of one that is proven to be?

9    A.  It can be harmful in two ways; one, the product itself

10   could be harmful to the patient, but the other thing is that

11   delaying a treatment that is known to be safe and effective can

12   be problematic.

13   Q.  And these concerns that you've mentioned, are they also

14   true for highly contagious diseases like the coronavirus,

15   COVID-19?

16   A.  These concerns exist for that as well, yes.

17   Q.  Okay.  So based on your research, did you form an opinion

18   as to whether Miracle Mineral Solution, MMS, is a drug?

19   A.  I did.

20   Q.  And what is that opinion?

21   A.  Based on the diseases that it was claimed to treat or cure,

22   that rendered it a drug in my opinion.

23   Q.  Okay.  And that was the conclusion you reached in spring of

24   2020?

25   A.  Correct.

1    Q.   And does that remain your opinion today?

2    A.   It does.

3    Q.   We talk about another term "new drug"; are you familiar

4    with that?

5    A.   Yes.

6    Q.   Okay.   And does that have a specific meaning under the FDCA

7    statute?

8    A.   It does.

9    Q.   Okay.   What is that definition?

10   A.   A drug is considered a new drug if it is not one that's

11   generally recognized as safe and effective for its intended

12   uses by experts qualified by their training and experience to

13   determine whether it's actually safe and effective for those

14   intended uses.

15   Q.   So when we are talking about the definition of a new drug,

16   it is not simply about whether it came out yesterday as opposed

17   to two months ago or a year ago, it is not about the time?

18   A.   That's correct.

19   Q.   Okay.   And it's about whether -- I think your words were

20   whether it's generally recognized as being safe and effective

21   for its intended use?

22   A.   Yes.

23   Q.   Okay.   Are there specific requirements for a drug to be

24   deemed safe and effective for its specific purposes?   Are there

25   specific things that we look at or you look at in determining

Case 1:21-cr-20242-CMA   Document 299   Entered on FLSD Docket 01/18/2024   Page 21 of 93
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA
21

1    that?

2    A.  For it to be generally recognized as safe and effective,

3    clinical studies, studies in human beings of the drug product

4    itself being used to treat the diseases that it's intended to

5    treat, have to have been conducted.  Those studies have to be

6    what we call adequate and well controlled.  Meaning, they have

7    to be carefully designed to scientifically prove the drug was

8    effective in treating that condition.

9        Those trials, after they have been conducted, have to be

10   made widely available so experts can actually see the trials,

11   examine them and determine whether they were appropriately

12   conducted and whether they truly showed that the product was

13   safe and effective for that particular use.

14   Q.  Okay.  Can you give the jury some of the criteria that are

15   used in determining whether something has an adequate or

16   well-controlled clinical study?  What are the kinds of things

17   that make such a study meet that requirement?

18   A.  There's a lot of steps that go into designing a clinical

19   trial, whether it is something to be published or, in

20   particular, for something that's to be looked at by FDA for

21   approval.  So one of those things that you have to have a large

22   enough number of patients in the trial; they have to actually

23   have the disease that's being evaluated; they have to be

24   compared with the new treatment they are receiving to something

25   else.

1        So it has to be a comparative trial.  That something else

2   can be a placebo, like a sugar pill; it can be another

3   treatment currently approved for that use.  Sometimes it's the

4   comparison of a high dose or a low dose of the same drug

5   product.  So it has to be something that you can compare the

6   new drug to.

7        The study has to be done in such a way that you minimize

8   potential bias.  So someone, for lack of a better word, playing

9   hanky-panicky with either the patients that are in the study

10  and how they get assigned to their groups, or the results that

11  come out of it.

12       So one of the ways to minimize bias is to blind the study.

13  So if I split the jury into two groups and they are going to

14  get treatment A and treatment B, I make it so that no one knows

15  whether they are getting treatment A or treatment B.  And the

16  person that's going to evaluate the jurors to see whether the

17  treatment worked or not, they're blinded, so they don't know

18  which treatment they got; so they can't pick a favorite and try

19  to sway things that way.

20       So there's blinding and then there is randomization, where

21  I don't decide which juror gets which treatment.  That's just

22  randomized.  So this way if the trial is big enough, you will

23  have an equal number of older people, younger people, men,

24  women, very sick, not so sick people in both groups.  So

25  randomization is a great equalizer.

1        So randomized, double blinded, controlled studies are the

2    types of things we are looking for.

3    Q.   Okay.  Why are these controlled studies and clinical trials

4    so important in evaluating potential new drugs?

5    A.   These are the ones that provide the scientific evidence

6    that experts can weigh in on outside the FDA, but experts

7    within the FDA.  This is what we use to determine whether the

8    drug is truly effective or not.

9        And the other thing that you get out of these comparative

10   studies when they are appropriately designed, they collect a

11   lot of safety data.  So then we can determine just how safe the

12   product is when it is used for that particular use, and you

13   have something to compare it to to know whether the two

14   treatments are similar in their risks or not.

15   Q.   Do anecdotes about whether a product worked or not count as

16   adequate and well-controlled studies of the kind you are

17   talking about?

18   A.   No, they do not.

19   Q.   How about paid testimonials?

20   A.   No, they do not.

21   Q.   How about e-mail reports about whether a product cured

22   something or not?

23   A.   They do not.

24   Q.   Podcasts, same thing?

25   A.   They do not.

1    Q.  Does the requirement of adequate and well-controlled

2    studies change if the maker of a drug, for example, provided a

3    hundred testimonials about something supposedly working?

4    A.  That doesn't constitute an adequate and well-controlled

5    study that we can tell.

6    Q.  Okay.  So in this assignment, did you seek to identify

7    whether there were any adequate and well-controlled studies

8    regarding Miracle Mineral Solution, MMS?

9    A.  I did.

10   Q.  And how did you do that, can you tell the jury?

11   A.  The National Institutes of Health has the National Library

12   of Health, and they run a website called PubMed, and PubMed

13   looks for articles from all different medical journals, both

14   from this company and around the world, and keeps track of

15   them.  And you can do searchs of PubMed to find things that

16   you're looking for, such as clinical trials.

17   Q.  Okay.  Is it fair to say if there were any rigorous studies

18   of a product like Miracle Mineral Solution, they would appear

19   in that database?

20   A.  They should, yes.

21   Q.  Did you input a variety of search terms relating to Miracle

22   Mineral Solution in your -- in this project into that database?

23   A.  I did.

24   Q.  And did you first do that in the spring of 2020 when you

25   initially worked on this project?

1   A.   I did.

2   Q.   And did you also update that search more recently?

3   A.   I did.

4   Q.   Did your searches identify any adequate or well-controlled

5   clinical studies of Miracle Mineral Solution?

6   A.   They identified no clinical studies for the product.

7   Actually, they identified no studies of the product whatsoever,

8   not only for the intended uses, but for any clinical uses.

9   Q.   Given the absence of any studies at all, have you formed an

10  opinion about whether Miracle Mineral Solution is generally

11  accepted as safe and effective for its labeled uses or any

12  clinical uses?

13  A.   Since there were no adequate studies available for experts

14  to weigh in on, there is no way for them to broadly determine

15  that it is safe and effective for any clinical use; so

16  therefore, it cannot be generally recognized as safe and

17  effective.

18  Q.   And accordingly, is Miracle Mineral Solution a new drug as

19  defined by the FDCA?

20  A.   Yes.  Since it cannot be generally recognized as safe and

21  effective, it is, by definition, a new drug.

22  Q.   Are you familiar with the term or the concept of an

23  "unapproved new drug"?

24  A.   I am.

25  Q.   Okay.  How do you get approval for a drug?  How do you go

Case 1:21-cr-20242-CMA   Document 299   Entered on FLSD Docket 01/18/2024   Page 26 of 93
July 19, 2023                                          26
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1    about doing that, generally, for the jury?

2    A.   So if -- if a product is a new drug, you have to come to

3    FDA to get it approved in order to market it in the United

4    States, and that approval process consists of lots of steps.

5    So the first thing is, you have to be able to make the product

6    reliably so that from batch to batch, pill the pill, bottle to

7    bottle, it's the exact same; the exact same inactive

8    ingredients, active ingredients; the same amounts of both; the

9    same purity.

10        Once a company is able to do that, the next step is to

11   actually do animal studies.  And in these studies, you look at

12   different doses in animals to determine the safety of the

13   product.  And you can start out with small groups of animals

14   and give them a low dose and then keep working with different

15   groups of animals at higher and higher dosage, looking to see,

16   does it damage the kidney, the brain, the liver, the heart?

17   Does it damage the offspring of those animals?

18        Once you have the animal data, then what happens is they

19   come back to the FDA and say, We think we are ready to actually

20   do human studies with this product, and there are four phases

21   to the human studies.  I can go into a little more detail if

22   you want.

23   Q.   Okay.

24   A.   So the first phase is basically healthy volunteers.  So you

25   get small groups of healthy individuals, usually in their 20s,

1    and break them up into groups that receive different doses of

2    the drug.  So just like the animals, you start out one group

3    gets the low dose; you check them for any kind of safety

4    problems that may arise.  You do all kinds of blood work,

5    x-rays, heart studies, things like that.  If they do okay, you

6    get another group and give them a slightly higher dose, and you

7    keep going up until you get to a point where the healthy

8    volunteers can't tolerate the drug anymore because of side

9    effects.  That's phase one.  So that identifies the upper dose

10   of the drug you can give.

11       Phase two, you actually take people that have the disease

12   that you want to treat, and then you break them up into small

13   groups and you start out giving them -- first group gets a low

14   dose; look, any problems with safety?  How about efficacy?

15   Does it treat the disease or not?  Then you get another group

16   and you give them higher doses until they can't tolerate it

17   anymore.

18       The phase two studies are to help you identify the dose

19   that you are going to actually be able to hopefully market the

20   drug for.  So typically the more drug you give, the more of an

21   effect you get and the better it is in treating the disease.

22   The problem is the more drug you give, the more side effects

23   you have.  So you are trying to find that sweet spot where you

24   get the most efficacy and the least harm.  Phase two does that.

25       Then phase three is where you take that dose that you've

1    identified and then do a very large adequate and

2    well-controlled study to prove the safety and efficacy of this

3    product at that dose in people that have that disease.  And

4    because the Food Drug and Cosmetic Act says studies, adequate

5    and well-controlled studies, plural, have to be done, the

6    companies generally have to at least repeat it once.

7    Q.  Let me ask you:  What is the point of all of these

8    requirements, all these steps that have to be gone through for

9    a drug to receive approval?

10   A.  The reason they have to do it is because you need some type

11   of scientific basis for saying yes, the drug really works when

12   it is given at this dose to treat this disease and here are the

13   risks associated with it, the side effects.  And what we do at

14   the end of the day, the FDA, is we weigh those benefits against

15   those risks to see if the benefits outweigh the risks, and if

16   they do and we come to agreement with how the product is to be

17   labeled, it gets approved.

18   Q.  Okay.  And all of this process, does that start with an

19   application of some kind?

20   A.  Ultimately once the company or the individual -- we call

21   them a sponsor.  When the sponsor thinks they have all the

22   information they need to get their new drug approved, they

23   submit a new drug application.

24   Q.  Did you examine, in the spring of 2020, whether there was

25   any approval or even an application for Miracle Mineral

July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1   Solution, or MMS?

2   A.   I did.

3   Q.   And have you updated your search again in 2023?

4   A.   I did.

5   Q.   Okay.  Is there any approval or any application for

6   approval for this product?

7   A.   There are three databases; two of them are public, anyone

8   can see them, the Orange Book is one and Drugs at FDA is the

9   other, those only show products that have been approved.  There

10  was no listing for Miracle Mineral Solution.

11       There is an internal database at the FDA where we track

12  everything that comes in for drug product, every letter the

13  company -- or every e-mail the company sends to us, every

14  response we send out, all the studies they submit.

15       So from the time they first say, Hey, we want to meet with

16  you about this idea we have for a new drug, to the time it's

17  actually approved, everything goes into that database.  I

18  searched that database.  There was nothing that had been

19  submitted by way of a new drug application that was in the

20  process of being reviewed.  There was nothing that had been

21  reviewed and was determined not to be approvable, and there was

22  never an interaction with anyone related to Miracle Mineral

23  Solution to say to the FDA, We would like to develop this

24  product, we'd like your input.

25  Q.   So you found nothing?

1   A.   I found nothing.

2   Q.   Based on that, do you have an opinion as to whether Miracle

3   Mineral Solution is an unapproved new drug?

4   A.   I do.

5   Q.   What is that opinion?

6   A.   It is an unapproved new drug for any of the intended uses

7   that were mentioned previously.   It is an unapproved new drug

8   for any clinical use whatsoever.   And because it's not a drug

9   that's being studied in one of those clinical trials, it's not

10  something that would be permitted to be shipped across state

11  lines for research purposes even.

12  Q.   I want to ask about another concept relating to drugs.   Are

13  you familiar with the concept of adequate directions for use by

14  a layperson under the FDCA?

15  A.   I am.

16  Q.   And I am using a shorthand for that.

17       What does that -- what does that mean?   What does "adequate

18  directions for use by a layperson," you can give the longer

19  version of that, what it's about?

20  A.   Drugs in this country cannot be marketed unless you can

21  provide the user, the person that's sick, parent of a child

22  who's sick, with the directions of how that drug is to be used

23  to treat the disease, and that includes everything from being

24  able to diagnosis the disease, to determining if this

25  particular drug product is the best one to treat yourself or

1    your child and then how to actually administer the drug and

2    what to watch out for by way of side effects when you are

3    administering and what to do if you get sicker even while you

4    are taking the drug, or if you don't get better after a certain

5    period of time.  So those would be what we call, quote,

6    adequate directions for use by a layperson, end quote.

7    Q.  Okay.  Just so we're clear, what is a layperson?  Who is a

8    layperson?

9    A.  Anyone that doesn't have medical training.

10   Q.  Okay.  So just for -- we understand what you are talking

11   about, what's an example of a drug where the jurors may be

12   familiar with and we are familiar with that have adequate

13   directions for use by a layperson?

14   A.  That does have?  Simple things you go into the store and --

15   you know, CVS, Publix, whatever, and you buy medicine for

16   seasonal allergy, or you buy Ibuprofen because you have aches

17   and pains.  When you look at the box, it will actually have

18   something called directions for use, and it will say these are

19   the ingredients in here, this is what you use it for, this is

20   how much you take, this is what to watch out for.  Don't use it

21   under these circumstances, and if there is a problem, here is

22   the phone number the call.  So those are the directions for use

23   by a layperson.

24   Q.  Can a layperson alone diagnosis and treat more serious

25   diseases like cancer or HIV or Alzheimer's?

July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1   A.   They cannot.

2   Q.   Do those kind of diseases require a medical professional

3   for diagnosis and treatment, at least?

4   A.   They do.

5   Q.   And if a layperson can't diagnosis and treat those types of

6   diseases on his or her own, can a drug intended to treat those

7   diseases ever have adequate directions for use by a layperson?

8   A.   Those drugs cannot.

9   Q.   Okay.  Based on your review of the claims that were made

10  for Miracle Mineral Solution, at least with regard to the

11  serious diseases we've talked about like cancer, does it have

12  directions sufficient to enable a layperson to use that drug

13  safely and for the purposes for which it is intended?

14  A.   It did not.

15  Q.   Okay.  Why not?

16  A.   Primarily because -- well, there were a number of issues,

17  but the big thing was the layperson cannot diagnosis these cure

18  -- these different diseases and determine the best products to

19  use to either treat or cure of them.

20  Q.   Okay.

21  A.   And just to be clear, so if you can't have adequate

22  directions for use by a layperson, how do you get these drugs

23  out there?  And then the answer is, those drugs are

24  prescription drug products; in part because you need some kind

25  of medical expertise for the use of them, and they have to get

July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1   approved by FDA with that exemption to the adequate direction

2   for use.

3   Q.  Just to close that loop, is there an approval process that

4   might exempt a drug from this adequate directions for use

5   process requirement?

6   A.  The new drug application takes care of that, yes.

7   Q.  Okay.  I think this is what you testified to earlier, but

8   just to be clear, are you aware of whether such approvals were

9   sought, let alone granted for Miracle Mineral Solution?

10  A.  You did ask that.  I did search, and I did not find any

11  approvals or any interaction with FDA seeking approval.

12  Q.  Okay.  Are you familiar with the term "misbranded" as used

13  in your job?

14  A.  Yes.

15  Q.  In your expertise and experience, what do you call a

16  product that lacks adequate directions for use but has not

17  received any approvals or exceptions?

18  A.  If it's being marketed, it would be a misbranded product.

19  Q.  Can a product such as Miracle Mineral Solution be

20  considered misbranded even if it has lots of words on the label

21  or elaborate protocols about how you are supposed to use it?

22  A.  Can you repeat the first part of that?

23  Q.  Sure.  Can if a drug doesn't qualify as having adequate

24  directions for use by a layperson, does it matter what

25  directions are put on the label of the drug or what

1   instructions are given by the person who's marketing it to

2   users?

3   A.   It -- it doesn't matter.   Those directions or whatever's

4   put on the labelling isn't something that has been backed up by

5   some kind of scientific evidence that was submitted to FDA for

6   approval.

7   Q.   Let me ask you about another way the drug can be

8   misbranded.   Does the FDCA have requirements for where a drug

9   is manufactured?

10  A.   It does.

11  Q.   Okay.   And why is that a concern of the statute and of the

12  FDA, where a drug is manufactured?

13  A.   It all relates to safety.   So when we talk about safety of

14  a drug, there is the safety of the actual drug product itself,

15  but there is also the safety of how it's made, the conditions

16  under which it's made.

17       So in the Food and Drug Cosmetic Act and the way we work

18  things at FDA, there are a lot of qualifications that are

19  necessary for a place to be able to actually make the drugs:

20  Where they get their ingredients.   How they check to make sure

21  the ingredients are as pure and actually have the ingredient in

22  it that they claim to have.

23       The facilities where they are making it, are these places

24  clean, are they roach infested?   How do they clean it?   Do they

25  have the equipment necessary to make the medications?   How do

July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1   they test the medications at the end of manufacturing to make

2   sure they really are, you know, safe from pill to bill, bottle

3   to bottle?  There is also requirements that they keep some drug

4   in reserve if there is ever an issue.  How the equipment is

5   maintained.  All that is part of the quality control, if you

6   will, of the drug product, and that's critical to its safety.

7   Q.  And is one of those concerns the risk of contamination of a

8   product, even if the product were otherwise okay from the

9   situation or from the place it is being made and how the

10  conditions are?

11  A.  It is a big concern.

12  Q.  Okay.  So one of those requirements about where a drug is

13  manufactured, must it be manufactured, prepared or processed in

14  something called a registered establishment; is that a

15  requirement?

16  A.  That's a requirement, yes.

17  Q.  Okay.  So what is a registered establishment?

18  A.  The Food Drug Administration has a database where -- for at

19  least on the drug side -- the companies that manufacture or

20  distribute, they come and they register with us so we know

21  where they are doing business, who the contact person is for

22  that business and we can go and inspect the facilities to make

23  sure they are up to what we call current good manufacturing

24  practices.  And if there is an issue with the drug, we can

25  trace it back to the facility so we know where to look for a

Case 1:21-cr-20242-CMA   Document 299   Entered on FLSD Docket 01/18/2024   Page 36 of 93
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA
36

1    problem and, if necessary, do a drug recall and hopefully nip

2    the problem in the bud.

3         And if there is a problem with one drug product that's made

4    at the facility, there's a possibility that other drugs that

5    are made at the same facility have the same problem and they

6    can be recalled.  This can be anything from cleaning solution

7    left in a bin where the medications are mixed or they sprayed

8    for roaches and rodents and some of that spray is still inside

9    the machine.  It's like -- unfortunately, we see a lot of it,

10   but the good news is usually because places are registered, we

11   can keep the harm to the public to the minimum.

12   Q.  Is this another part of your responsibility or the FDA's

13   responsibility to assure the drugs are safe and effective for

14   people to use them?

15   A.  It is part of FDA's job.

16   Q.  Okay.  Were you asked to run certain searchs associated

17   with Miracle Mineral Solution to see if they were associated

18   with a registered establishment?

19   A.  I was.

20   Q.  Okay.  And what did you search?  How did you do that?

21   A.  We have a database that includes the -- the names of all

22   the drugs, the names of all the manufactures and you can search

23   for either one, or the actual addresses of the facilities.  So

24   I conducted those searchs for an address provided and for the

25   drug product name and the name of the people associated with

1    it.

2    Q.  So if a person or a drug maker or a facility were

3    registered with the FDA, would be in that database?

4    A.  It would be, yes.

5    Q.  Okay.  Did you initially search for the period April 2010

6    through July 2020; does that sound right?

7    A.  I did.

8    Q.  Okay.  And have you since updated your search for a time

9    frame to include 2023?

10   A.  I did.

11   Q.  Okay.  And did you search a variety of names and products

12   associated with Miracle Mineral Solution?

13   A.  I did.

14   Q.  Okay.  And did you also search specifically an address 2014

15   Garden Lane, Bradenton, Florida?

16   A.  I believe that's the address I searched, yes.

17   Q.  Did you find any registrations for that address or for

18   anything related to Miracle Mineral Solution?

19   A.  I did not.

20   Q.  So is it fair to say that if Miracle Mineral Solution were

21   manufactured at that address I just gave you, 2014 Garden Lane

22   in Bradenton, it would be made at an unregistered facility?

23   A.  That is correct.

24   Q.  Since Miracle Mineral Solution was not manufactured at a

25   registered establishment, do you have an opinion as to whether

```
 1   that makes it a misbranded drug in this way also?

 2   A.  It does make it misbranded, yes.

 3          MR. SHIPLEY:  No further questions, Your Honor.

 4          Thank you, Dr. Simone.

 5          Thank you members of the jury.

 6          THE COURT:  Any cross-examination from the Defendants?

 7          (No audible response.)

 8          THE COURT:  Hearing no answer.

 9          Thank you very much, Doctor.

10          THE WITNESS:  You're welcome.

11          THE COURT:  You have a good day.

12          THE WITNESS:  You too.  Thank you.

13      (Witness excused.)

14          THE COURT:  Any other witnesses?

15          MR. HOMER:  No, Your Honor.  At this time, the

16   Government will rest its case.

17          THE COURT:  Thank you.

18          Ladies and gentlemen, we will give you a brief recess.

19   Please return to the jury room, and please don't discuss the

20   case.

21          COURT SECURITY OFFICER:  All rise.

22      (The jury exited the courtroom at 2:46 p.m.)

23          THE COURT:  To the Defendants, the Government has

24   rested, that means it has completed presenting the testimony in

25   evidence that it wished to the jury.  Do you have any motions
```

1    you would like to make now at the close of the Government's

2    case?

3              (No audible response.)

4              THE COURT:  Receiving no response.

5              Do you wish to testify in this trial and have the jury

6    hear and consider your testimony?

7              To Mark Grenon?

8              (No audible response.)

9              THE COURT:  No response.

10             To Jonathan Grenon?

11             (No audible response.)

12             THE COURT:  No response.

13             To Jordan Grenon?

14             (No audible response.)

15             THE COURT:  Giving me no response.

16             And Joseph Grenon?

17             (No audible response.)

18             THE COURT:  No response.

19             Do you gentlemen have any witnesses you would like to

20   present to give testimony and evidence for the jury to

21   consider?

22             (No audible response.)

23             THE COURT:  Receiving no response.

24             I do have two standby counsel here in the courtroom.

25   Mr. Wylie and Mr. Donnelly, is there anything you gentlemen

```
1   would like to say, or would you like a moment to speak to the
2   Defendants whom I have appointed you to represent as standby
3   counsel?
4           MR. WYLIE:  If we could have a moment, Your Honor.
5           THE COURT:  Very well.  Thank you.
6       (Pause in proceedings.)
7           MR. WYLIE:  Your Honor, on behalf of Jordan Grenon, I
8   have nothing to add.
9           MR. DONNELLY:  The same, Judge.  I -- I spoke with
10  Joseph, and we have nothing.
11          THE COURT:  Thank you.  So what comes next is for the
12  Government to present closing arguments.  Defendants, you have
13  the ability to present closing arguments as well.  I will ask
14  you that question now, so as not to ask it in front of the
15  jury.
16          Would you like to present any closing arguments after
17  the Government has summarized the evidence and addressed the
18  law with the jury?
19          (No audible response.)
20          THE COURT:  Receiving no response.
21          I believe my courtroom deputy will come out shortly
22  with the jury instructions, as I have reformatted them and made
23  some changes to them, as well as the verdict form.  We will
24  pass those out to the Grenons; if they choose to read them,
25  they will be there at the table for you to look at, and let me
```

```
 1    know if you have any objection.  And they will be passed out to
 2    standby counsel as well if you have any objections you would
 3    like to make or request any additions to the instructions.
 4            And here, we have the documents for your review.  They
 5    are being passed out now to the Grenons.
 6            Those are the instructions on the law that I will give
 7    the jury that they will use to decide this case.  You may wish
 8    to read them and let me know if you have any objection or if
 9    you would like me to add anything to that.
10            I will ask the Government the same, to let me know if
11    there are any issues you have with those instructions, and then
12    Mr. Wylie and Mr. Donnelly as well.
13            I won't be giving any time limits on the closing.
14            MR. SHIPLEY:  Should be 25, 30 minutes, Your Honor.
15            THE COURT:  However long you like.
16            MR. SHIPLEY:  Can we have a moment to just take a look
17    at these?
18            THE COURT:  Of course.
19            MR. SHIPLEY:  May we be seated, Your Honor?
20            THE COURT:  Of course.
21        (Pause in proceedings.)
22            THE COURT:  I don't know if the first full paragraph
23    in Paragraph 2 is necessary.
24        (Pause in proceedings.)
25            MR. SHIPLEY:  Your Honor, I think the last two
```

1    sentences probably aren't necessary, but I would ask to keep

2    the first two sentences.

3              THE COURT:  All right.

4              MR. SHIPLEY:  I know all of that is on the record

5    about the opportunities you gave them, but I still think it is

6    important for the jury to be reminded.

7              THE COURT:  All right.

8              MR. SHIPLEY:  If not, I don't think the last -- third

9    sentence I don't think is necessary.  The fourth sentence I

10   think is covered by other language in the instructions.

11             THE COURT:  Very well.

12             MR. SHIPLEY:  So we have no objection to striking

13   those last few sentences.

14        (Pause in proceedings.)

15             THE COURT:  All right.  We will give you five more

16   minutes or so.  We will take a brief restroom break and then we

17   will continue.

18             MR. SHIPLEY:  Your Honor, just one other thing just to

19   flag, in the portion of the instructions addressing the First

20   Amendment.

21             THE COURT:  I deleted some of those sentences; I

22   didn't think they were necessary.

23             MR. SHIPLEY:  Just the version, just so I am clear,

24   and I apologize if I'm understanding, the language that's in

25   here is different than the Court gave at the start of the

case --

THE COURT:  It is based on the language you had in the instructions you supplied me, and I just deleted two sentences.

MR. SHIPLEY:  Correct.  If I could make the request, we are comfortable with the Court using the same language that you used at the start of the case.  And I apologize for any confusion; we submitted these before we had the follow-up status conference.  I think from our standpoint, just for consistency, the language that the Court gave at the start of the case can be repeated and that's sufficient.  What we submitted initially was longer, we cut it back to really focus on what the heart of the problem was.

THE COURT:  Okay.

MR. SHIPLEY:  And also the fact that we haven't really heard any speech from the Defendants if there is no issue about whether their statements could be considered by the jury.

THE COURT:  You're right.  That last sentence would be unnecessary.  So I am taking out that last one.  Let me see.

MR. SHIPLEY:  And we would ask, what is two paragraphs now, if the Court would respectfully strike those and use the same language that you used at the start of the case.

THE COURT:  All right.

(Pause in proceedings.)

THE COURT:  Thank you.  I made that change.  We will give you updated copies so you can have those as well.

```
 1              MR. SHIPLEY:  And if, Your Honor, we could just have a

 2    few minutes while the Court takes a break to get the court set

 3    up.

 4              THE COURT:  Of course.

 5              MR. SHIPLEY:  I will have a PowerPoint that I will

 6    have up as well --

 7              THE COURT:  Very good.

 8              MR. SHIPLEY:  If we could get that screen.

 9              THE COURT:  So you let us know when you are ready.

10              MR. SHIPLEY:  Okay, we sure can.

11              THE COURT:  Thank you.

12              MR. SHIPLEY:  Thank you, Judge.

13              COURT SECURITY OFFICER:  All rise.

14       (A recess was taken from 2:59 p.m. to 3:16 p.m.)

15              THE COURT:  All right.  Are we ready?  Do you all have

16    the jury instructions?  Yes?

17              MR. SHIPLEY:  Yes, Your Honor.  It looks fine.

18              THE COURT:  Okay.

19              Let's bring the jury in, please.

20              MR. SHIPLEY:  Your Honor, one request is, would the

21    Court consider reading the jury instructions before closing

22    arguments?

23              THE COURT:  I can certainly do that, if you prefer.

24              MR. SHIPLEY:  That would be our request.

25              THE COURT:  All right.
```

1          MR. SHIPLEY:  Thank you, Judge.

2      (Pause in proceedings.)

3          COURT SECURITY OFFICER:  Are we ready, Your Honor?

4          THE COURT:  Yes, I am.  Thank you so much.

5          COURT SECURITY OFFICER:  All rise for the jury.

6      (The jury entered the courtroom at 3:17 p.m.)

7              COURT'S CLOSING JURY INSTRUCTIONS

8          THE COURT:  Everyone, please be seated.

9          Members of the jury, at this time, I am going to ask

10     the court security officer to pass out -- pass out to you my

11     instructions to you on the law which we will read before you

12     hear the attorney and the parties' closing arguments.  You will

13     each have your own set of instructions to take back with you

14     and use during your deliberations.

15         Very good.

16         Members of the jury, it is my duty to instruct you on

17     the rules of law that you must use in deciding this case.

18     After I have completed these instructions, you will go to the

19     jury room and begin your discussions, what we call your

20     deliberations.

21         You must decide whether the Government has proved the

22     specific facts necessary to find the Defendants guilty beyond a

23     reasonable doubt.  Your decision must be based only on the

24     evidence presented during the trial.  You must not be

25     influenced in any way by either sympathy for or prejudice

1    against the Defendants or the Government.

2            You must follow the law as I explain it, even if you

3    do not agree with the law, and you must follow all of my

4    instructions as a whole.  You must not single out or disregard

5    any of the Court's instructions on the law.

6            The indictment is not evidence of guilt.  The law

7    presumes every defendant is innocent.  The Defendants do not

8    have to prove their innocence or produce any evidence at all.

9    A Defendant does not have to testify, and if the Defendants

10   chose not to testify, you cannot consider that in any way while

11   making your decision.  The Government must prove guilt beyond a

12   reasonable doubt; if it fails to do so, you must find the

13   Defendants not guilty.

14           The Defendants have decided to represent themselves in

15   this trial and not use the services of a lawyer.  They have a

16   constitutional right to do that.  Their decision has no bearing

17   on whether they are guilty or not guilty, and it must not

18   affect your consideration of the case.

19           Given that Defendants decided to act as their own

20   lawyers, the Defendants were entitled to speak at various times

21   during the trial.  They were allowed to make opening statements

22   and closing arguments and ask questions of the witnesses, make

23   objections and argue legal issues to the Court.

24           The Government's burden of proof is heavy, but it does

25   not have to prove a Defendant's guilt beyond all possible

1   doubt.  The Government's proof only has to exclude any

2   reasonable doubt concerning the Defendant's guilt.

3        A "reasonable doubt" is a real doubt based on your

4   reason and common sense after you have carefully and

5   impartially considered all the evidence in the case.

6        "Proof beyond a reasonable doubt" is proof so

7   convincing that you would be willing to rely and act on it

8   without hesitation in the most important of your own affairs.

9   If you are convinced that the Defendants have been proved

10  guilty beyond a reasonable doubt, say so.  If you are not

11  convinced, say so.

12       As I said before, you must consider only the evidence

13  that I have admitted in the case.  Evidence includes the

14  testimony of witnesses and the exhibits admitted.  Anything the

15  lawyers say is not evidence and is not binding on you.  In

16  addition, anything the Defendants may say that is not admitted

17  by me as evidence is not binding on you.

18       You should not assume from anything I have said that I

19  have any opinion about any factual issue in this case.  Except

20  for my instructions to you on the law, you should disregard

21  anything I may have said during the trial in arriving at your

22  own decision about the facts.

23       Your own recollection and interpretation of the

24  evidence is what matters.

25       In considering the evidence, you may use reasoning and

1    common sense to make deductions and reach conclusions.  You

2    should not be concerned about whether the evidence is direct or

3    circumstantial.

4          "Direct evidence" is the testimony of a person who

5    asserts that he or she has actual knowledge of a fact, such as

6    an eyewitness.

7          "Circumstantial evidence" is proof of a chain of facts

8    and circumstances that tend to prove or disprove a fact.  There

9    is no legal difference in the weight you may give to either

10   direct or circumstantial evidence.

11         When I say you must consider all the evidence, I do

12   not mean that you must accept all the evidence as true or

13   accurate.  You should decide whether you believe what each

14   witness has to say and how important that testimony was.  In

15   making that decision, you may believe or disbelieve any witness

16   in whole or in part.  The number of witnesses testifying

17   concerning a particular point does not necessarily matter.

18         To decide whether you believe any witness, I suggest

19   you ask yourself a few witness -- or questions.  Did the

20   witness impress you as one who was telling the truth?

21         Did the witness have any particular reason not to tell

22   the truth?

23         Did the witness have a personal interest in the

24   outcome of the case?

25         Did the witness seem to have a good memory?

1           Did the witness have the opportunity and ability to

2    accurately observe the things he or she testified about?

3           Did the witness appear to understand the questions

4    clearly and answer them directly?

5           Did the witness's testimony different from other

6    testimony or other evidence?

7           When scientific, technical or other specialized

8    knowledge may be helpful, a person who has special training or

9    experience in that field is allowed to state an opinion about

10   the matter, but that does not mean that you must accept the

11   witness's opinion.  As with any other witness's testimony, you

12   must decide for yourself whether to rely upon the opinion.

13          The Indictment charges that three separate crimes

14   called -- charges three crimes called counts.  Each count has a

15   number.  You will be given a copy of the Indictment to refer to

16   during your deliberations.

17          In summary, Count 1 charges that the four Defendants

18   knowingly and willfully engaged in a conspiracy to defraud the

19   United States, specifically the United States Food and Drug

20   Administration, the FDA, and also to violate specific criminal

21   laws of the United States.

22          Counts 2 and 3 charge that Defendants Jonathan and

23   Jordan Grenon committed contempt of court, which is a

24   "substantive" offense.  I will explain the law governing that

25   substantive offense in a moment.

1        But first, note that the Defendants are not charged in

2   Count 1 with committing a substantive offense, they are charged

3   with conspiring to commit an offense.  I will now give you

4   specific instructions on conspiracy.

5        It is a separate federal crime for anyone to conspire

6   or agree with someone else to defraud the United States or one

7   of its agencies such as the FDA, or to conspire or agree to do

8   something that would be another federal crime if it were

9   actually carried out.

10       A "conspiracy" is an agreement by two or more persons

11  to commit an unlawful act.  In other words, it is a kind of

12  partnership for criminal purposes.  Every member of the

13  conspiracy becomes the agent or partner of every other member.

14       The Government does not have to prove that all the

15  people named in the indictment were members of the plan or that

16  those who were members made any kind of formal agreement.  The

17  Government does not have to prove that the members planned

18  together all the details of the plan or the "overt acts" that

19  the indictment charges would be carried out in an effort to

20  commit the intended crime.

21       The heart of a conspiracy is the making of the

22  unlawful plan itself followed by the commission of any overt

23  act.  The Government does not have to prove that the

24  conspirators succeeded in caring out the plan.

25       Defendants can be found guilty of this crime only if

all the following facts are proved beyond a reasonable doubt:

One, two or more persons in some way agreed to try to accomplish a shared and unlawful plan;

Two, the Defendants knew the unlawful purpose of the plan and willfully joined in it;

Three, during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and Four, the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

An "overt act" is any transaction or event, even one that may be entirely innocent when viewed alone, that a conspirator commits to accomplish some object of the conspiracy.

A person may be a conspirator without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators.

If a Defendant played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan and willfully joined in the plan on at least one occasion, that is sufficient for you to find the Defendant guilty.

But simply being present at the scene of an event or merely associating with certain people and discussing common goals and interest does not establish proof of a conspiracy.  A person who does not know about a conspiracy but happens to act

1    in a way that advances some purpose of one does not

2    automatically become a conspirator.

3         Count 1 charges that the Defendants conspired to

4    defraud the United States, and also conspired to commit two

5    substantive federal crimes:  Distributing an unapproved new

6    drug and distributing a misbranded drug.  In other words, the

7    Defendants are charged with conspiring to do three things,

8    these are called the "objects" of the conspiracy.

9         The Government does not have to prove that the

10   Defendants willfully conspired to commit all three objects of

11   the conspiracy.  In other words, the Government does not have

12   to prove that the Defendants conspired to defraud the FDA and

13   to commit the offense of distributing an unapproved new drug

14   and to commit the offense of distributing a misbranded drug.

15   It is sufficient if the Government proves beyond a reasonable

16   doubt that the Defendants willfully conspired to commit one of

17   those objects.  To find the Defendants guilty of Count 1, you

18   must all agree about which objects the Defendants conspired to

19   commit.

20        The first object of the criminal conspiracy charged in

21   Count 1 is that the Defendants conspired to defraud the United

22   States, specifically the FDA.  To "defraud" the FDA, for

23   purposes of this charge, means to interfere with any of the

24   FDA's lawful functions by deceit, craft or trickery, even if

25   the FDA does not suffer a loss of money or property.

Court transcript proceeding
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1    The FDA has broad authority to regulate drugs in the

2    United States in order to protect the health and safety of

3    consumers.  This broad authority includes the lawful functions

4    to:  Regulate an interstate distribution of drugs and their

5    components; ensure that drugs are safe and effective for their

6    intended uses; prevent the unlawful sale and distribution of

7    drugs not approved for sale and distribution in the United

8    States; ensure that drugs, where required, bear adequate

9    directions for use; and ensure that drugs are manufactured only

10   in duly registered facilities.

11   The second object of the criminal conspiracy charged

12   in Count 1 is that Defendants conspired to commit an offense

13   against the United States; specifically, to violate the FDCA,

14   which makes it a federal crime for anyone to cause the

15   introduction or delivery for introduction into interstate

16   commerce of any unapproved new drug.

17   The Government alleges that Miracle Mineral Solution

18   was a "new drug," as that term is defined later in these

19   instructions, and that the FDA had not approved Miracle Mineral

20   Solution for introduction or delivery into interstate commerce.

21   Defendants can be found guilty of this crime only if

22   all the following facts are proved beyond a reasonable doubt:

23   One, that the Defendants caused a new drug to be

24   introduced or delivered into introduction into interstate

25   commerce;

1          Two, the new drug was, at the time, an unapproved new

2    drug as defined below; and Three, that the Defendants acted

3    with intent to defraud or mislead.

4          An article is a "drug" if it is intended for use in

5    the diagnosis, cure, mitigation, treatment or prevention of

6    disease in humans, or if it is intended to affect the structure

7    or any function of the human body.  It is the intended use of a

8    substance which determines whether it is a drug under the FDCA

9    and not the nature or composition of the article, or whether

10   and how the article actually affects the structure or any

11   function of the human body.

12         A product's intended use is what a reasonable person

13   would conclude the manufacturer or seller intended based on all

14   the relevant information.  You can determine the intended use

15   of a product by considering the label, accompanying labelling,

16   promotional material, advertising, oral representations made

17   about the product, the circumstances surrounding the

18   distribution of the article and information from any other

19   source which discloses intended use.

20         I would ask the court security officer to bring me

21   some water, please.  Thank you.

22         The term "new drug," as pertinent here, means "any

23   drug... the composition of which is such that such drug is not

24   generally recognized by experts qualified by scientific

25   training and experience to evaluate the safety and

1    effectiveness of drugs as safe and effective for use under the

2    conditions prescribed, recommended or suggested in the

3    labelling thereof."  The Government does not have to show a

4    product is new in the sense that it was recently made or in

5    fact unsafe or ineffective.

6            Thank you, so much.

7            COURT SECURITY OFFICER:  You're welcome.

8            THE COURT:  But simply that it was not generally

9    recognized among qualified experts as having been adequately

10   shown to be safe and effective when used in the manner

11   prescribed, recommended or suggested in its labelling.

12           A "general recognition" of a drug's safety and

13   effectiveness must be based on three conditions.  First, there

14   must be substantial evidence of the drug's effectiveness that

15   would be sufficient to obtain FDA's approval for the drug.

16           "Substantial evidence" is evidence consisting of

17   adequate and well-controlled investigations, including clinical

18   investigations, upon which qualified experts can fairly and

19   reasonably conclude that it will have the effect it is

20   represented to have, such as to cure a disease.

21           Second, the "adequate and well-controlled

22   investigations" must be published in the scientific literature

23   so that they are made generally available to the community of

24   qualified experts and are thereby subject to peer evaluation,

25   criticism and review.

1        The published investigations must be of the safety and

2   efficacy of the complete drug as opposed just to some of the

3   ingredients in the drug.  The absence of literature

4   establishing the safety and effectiveness of the drug is proof

5   that the requisite general recognition does not exist.

6   Anecdotal and testimonial evidence from doctors or patients

7   regarding the safety and effectiveness of a new drug is not

8   sufficient to meet the standards of the FDCA with respect to

9   establishing the drug's safety and effectiveness.  In addition,

10  general recognition of safety and effectiveness cannot be based

11  on clinical impressions, of practicing physicians or patients,

12  poorly controlled experiments, isolated case reports, random

13  experience or reports lacking the details which permit

14  scientific evaluation.

15       Third, there must be a consensus among qualified

16  experts based on adequate and well-controlled published

17  investigations of the drug that the drug is safe and effective

18  for each of its labeled indications.  If you find that any of

19  these three conditions fails to exist for the drug, then the

20  drug was not generally recognized as safe and effective and,

21  therefore, was a new drug.

22       An "unapproved new drug" is a drug for which FDA has

23  not approved a New Drug Application, Abbreviated New Drug

24  Application or Investigational New Drug Application.

25       "Interstate commerce" means commerce between any state

1    and any place outside thereof.

2          To act with "intent to defraud" means to act with a

3    specific intent to deceive or cheat.  The Government does not

4    have to prove that anyone was, in fact, defrauded.

5          To act with "intent to mislead" means to act with the

6    specific intent to create a false impression by misstating,

7    omitting or concealing facts.  It is not necessary to prove

8    that anyone was, in fact, misled.

9          A Defendant can act with the intent to defraud or to

10   mislead either the consumers of the Defendants' products or the

11   Government.

12         To act with the intent to defraud or mislead the

13   consumers of a product means to act with the specific intent to

14   defraud or mislead either the direct purchaser of the product,

15   or subsequent purchasers or users, about the nature of the

16   products being used or purchased or some significant fact or

17   aspect of the product being used or purchased.

18         To act with the intent to defraud or mislead the

19   Government means to act with the specification intent to

20   interfere with or obstruct a lawful Government function by

21   deceit, craft or trickery, or at least by means that are

22   dishonest.

23         I have instructed you about the elements of this

24   substantive offense so that you can understand what the

25   Defendants allegedly conspired to do.  Let me remind you that

1  in Count 1, the Defendants are not charged with committing

2  these substantive offense of distributing an unapproved new

3  drug, rather they are charged with agreeing or conspiring to do

4  so.

5  The third object of the criminal conspiracy charged in

6  Count 1, is that the Defendants conspired to commit another

7  offense, specifically, to violate another provision of the FDCA

8  which makes it a federal crime for anyone to cause the

9  introduction or delivery for introduction into interstate

10  commerce of a misbranded drug.  I will instruct you on two ways

11  in which a drug may be misbranded within the meaning of

12  21 U.S. Code, Section 352.

13  The Defendants can be found guilty of this crime only

14  if all the following facts are proved beyond a reasonable

15  doubt:

16  One, that Defendants caused a drug to be introduced or

17  delivered for introduction into interstate commerce;

18  Two, that the drug was misbranded; and

19  Three, that the Defendants acted with the intent to

20  defraud or mislead.

21  I have already defined the term "drug" and instructed

22  you about the meaning of "interstate commerce" and to "act with

23  the intent to defraud or mislead."

24  A product may be "misbranded," as relevant here, in

25  either of two ways.  One, a drug is misbranded if its labelling

Case 1:21-cr-20242-CMA   Document 299   Entered on FLSD Docket 01/18/2024   Page 59 of 93

59

Court reporting text section
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

 1   lacks adequate directions for use.  "Adequate directions for

 2   use" means directions sufficient to enable a layperson to use a

 3   drug safely and for the purposes for which it is intended.

 4        A second way that a drug can be misbranded is if it

 5   was manufactured, prepared, propagated, compounded or processed

 6   in an establishment not duly registered under the FDCA.  The

 7   FDCA requires that during the period beginning on October 1 and

 8   ending on October 31 of each year, every person who owns or

 9   operates any establishment in any state engaged in the

10   manufacture, preparation, propagation, compounding or

11   processing of a drug or drugs shall register with the Secretary

12   the name of such person, places of business of such person, all

13   such establishments, the unique facility identifier of each

14   such establishment and a point of contact e-mail address.

15        Let me remind you again that in Count 1, the

16   Defendants are not charged with committing the substantive

17   offense of distributing a misbranded drug.  Rather, they are

18   charged with agreeing or conspiring to do so.  I have

19   instructed you about the elements of the substantive offense so

20   that you can understand what the Defendants allegedly conspired

21   to do.

22        It is a federal crime for anyone to willfully disobey

23   or resist any order of any court of the United States.

24        Defendants Jonathan Grenon and Jordan Grenon can been

25   found guilty of this crime only if all the following facts are

 1    proved beyond a reasonable doubt:

 2         One, a court of the United States entered an order of

 3    reasonable specificity;

 4         Two, Defendants violated the order; and Three, the

 5    violation was willful.

 6         United States District Court for the Southern District

 7    of Florida is a court of the United States.

 8         A willful violation is a deliberate or intended

 9    violation, as distinguished from an accidental, inadvertent or

10    negligent violation of an order.

11         If the Government proves the elements I just

12    described, it is not a defense that Defendants believed in good

13    faith that the order was unlawful or that the order was, in

14    fact, unlawful in some way.

15         You will see that the Indictment charges that crimes

16    were committed "on or about" certain dates.  The Government

17    does not have to prove that the crimes occurred on exact dates.

18    The Government only has to prove beyond a reasonable doubt that

19    the crimes were committed on dates reasonably close to the

20    dates alleged.

21         The word "knowingly" means that an act was done

22    knowingly and voluntarily and not because of mistake or by

23    accident.  I have given you a careful instruction about the

24    word willfully in reference to the contempt charges in Counts 2

25    and 3, and you should follow that instruction on deciding those

1    counts.  As used elsewhere in these instructions, the word

2    "willfully" means that the act was committed voluntarily and

3    purposely with the intent to do something the law forbids; that

4    is, with the bad purpose to disobey or disregard the law.

5    While a person must have acted with the intent to do something

6    the law forbids before you can find that the person acted

7    willfully, the person need not be aware of the specific law or

8    rule that his conduct may be violating.

9         You may not draw any inference, favorable or

10   unfavorable, toward the Government or the Defendants on trial

11   from the fact that any person, in addition to the Defendants,

12   is not on trial here.  You may also not speculate as to the

13   reasons why other persons are not on trial, neither may you

14   speculate as to the reasons why certain Defendants are charged

15   in some counts of the indictment but not others.  Those matters

16   are wholly outside your concern and have no bearing on your

17   function as jurors.

18        The Government must prove each of the elements of a

19   charged offense beyond a reasonable doubt, including those

20   elements relating to a Defendant's state of mind.  But if you

21   find that the Defendants had the state of mind necessary to

22   commit the crimes charged in the indictment, then it is not a

23   defense that the Defendants believed that violating the law was

24   religiously, politically or morally required or that ultimate

25   good would result.

1        The First Amendment to the United States Constitution

2   establishes certain rights which benefit everyone.  A person

3   has a right to believe any religion or no religion and express

4   any point of view.  But the First Amendment does not protect

5   the kind of activity charged in this case.

6        Having instructed you concerning the rights of each

7   Defendant under the First Amendment, I also instruct you that

8   the First Amendment is not a defense to the crimes charged.  If

9   the Government proves all the elements of those crimes beyond a

10  reasonable doubt, you must return a verdict of guilty

11  regardless of whether Defendants' conduct had some connection

12  to religious activity.

13        Each count of the indictment charges a separate crime

14  against one or more of the Defendants.  You must consider each

15  crime and the evidence relating to it separately, and you must

16  consider the case of each Defendant separately and

17  individually.  If you find a Defendant guilty of one crime,

18  that must not affect your verdict for any other crime or any

19  other Defendant.

20        I caution you that each Defendant is on trial only for

21  the specific crimes charged in the indictment.  You are here to

22  determine from the evidence in this case whether each Defendant

23  is guilty or not guilty of those specific crimes.

24        You must never consider punishment in any way to

25  decide whether a Defendant is guilty.  If you find a Defendant

1    guilty, the punishment is for the Judge alone to decide later.

2           You have been permitted to take notes during the

3    trial.  Most of you, perhaps all of you, have taken advantage

4    of that opportunity.  You must use your notes only as a memory

5    aid during deliberations.  You must not give your notes

6    priority over your independent recollection of the evidence,

7    and you must not allow yourself to be unduly influenced by the

8    notes of other jurors.

9           I emphasize that notes are not -- not entitled to any

10   greater weight than your memories or impressions about the

11   testimony.

12          Your verdict, whether guilty or not guilty, must be

13   unanimous.  In other words, you must all agree.  Your

14   deliberations are secret and you will never have to explain

15   your verdict to anyone.

16          Each of you must decide the case for yourself, but

17   only after fully considering the evidence with the other

18   jurors.  So you must discuss the case with one another and try

19   to reach agreement.

20          While you are discussing the case, do not hesitate to

21   re-examine your own opinion and change your mind if you become

22   convinced that you were wrong, but do not give up your honest

23   beliefs just because others think differently or because you

24   simply want to get the case over with.

25          Remember, in a very real way, you are judges, judges

1    of the facts.  Your only interest is to seek the truth from the

2    evidence in the case.

3          When you go to jury room, please choose one of your

4    members to act as foreperson.  The foreperson will direct your

5    deliberations and speak for you here in court.

6          A verdict form has been prepared for your convenience.

7    You will take the verdict form with you into the jury room, and

8    when you have all agreed on the verdict, your foreperson must

9    fill in the form, sign it, date it and carry it.  Then you will

10   return with it to courtroom.

11         If you wish to communicate with me at any time, please

12   write down your message or question and give it to the marshal.

13   The marshal will bring it to me and I will respond as promptly

14   as possible, either in writing or by talking to you here in the

15   courtroom.  But I caution you not to tell me how many jurors

16   have voted one way or the other at that time.

17         Ladies and gentlemen, you will hear the closing

18   arguments now from the Government.  And keep your notebooks

19   closed.  I've allowed note-taking during the evidence portion

20   of the trial but not during opening and closing.

21         MR. SHIPLEY:  Thank you, Your Honor.  May it please

22   the Court.

23         Stephanie, can you switch the screen?

24         CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

25         MR. SHIPLEY:  Good afternoon, ladies and gentlemen.

Closing Argument on behalf of the Government
July 19, 2023                                    65
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1    The four Defendants on trial knew that selling Miracle Mineral

2    Solution as a cure for the diseases that strike fear in the

3    hearts of all of us when we hear them from the doctor or from a

4    loved one, was illegal.  In an act of deliberate dishonesty,

5    these Defendants created a fake, nonreligious church, the

6    Genesis II Church of Health and Healing, to try to interfere

7    with the ability of the FDA, the Government and eventually, as

8    you heard, the courts to stop them from doing it.

9           How do we know this?  They said so themselves.

10   Remember Government's Exhibit 15?  And there are other examples

11   of this in the evidence that you heard.  This was Mark Grenon

12   and Joseph Grenon in one of their infomercial podcasts talking

13   about how the idea of the church came about in approximately

14   2010.

15          Mark Grenon was talking about how, be it a seminar or

16   the small group of his supporters in the Dominican Republic had

17   raised the idea of creating this church as the way to

18   distribute Miracle Mineral Solution.  And as he described it,

19   people thought it was a terrible idea; it's crazy, you can't do

20   this.

21          What did he say in his own words?  You've got to do

22   this, folks, or we are going to go to jail.  The Defendant's

23   words, not the FDA's, not a court's, not mine.

24          Now, before we go any further, let's clear up one

25   thing.  As Chief Judge Altonaga told you at the very start of

1    this case, there is no First Amendment defense for the kind of

2    criminal activity charged in this indictment.  You can't create

3    a fake church and go out and violate the law.

4             You all took an oath to follow the Court's

5    instruction.  The First Amendment is incredibly important to

6    all of us as Americans, but it is not a safe harbor for doing

7    what the Defendants did in this case.

8             But the fact that the Defendants came up with this

9    trick is powerful proof that this whole scam, this whole

10   Miracle Mineral Solution scheme was built on deception and

11   dishonesty.

12            Now, why around 2010 did the Defendants come up with

13   this idea of a fake church?  Well, you heard in the evidence

14   from Special Agent Rivera that it was at this time that the FDA

15   put out the first of its warnings about how damaging and

16   dangerous this product could be.  You will have an opportunity

17   to the review that notice and all the evidence when you go back

18   to the jury room.  And they talked about all the reports that

19   the FDA had received about people who suffered as a result of

20   taking this stuff.

21            You notice in that notice it refers to the "Miracle

22   treatment turns into a potent bleach."  We talked a lot about

23   bleach in this case.  You heard the evidence that chlorine

24   dioxide is not just the kind of Clorox that you may have on

25   your shelves at home.  It is an industrial bleach.  It is used

Closing Argument on Behalf of the Government
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1    for bleaching paper and wood and treating large quantities of

2    water.

3         Where does this term "bleach" come from?  Is it just

4    the prosecutors, just the FDA?  Absolutely not.

5         Again, we have the words of the Defendants.  You

6    remember this exchange?  Hopefully you can see it on your

7    screen more closely than I can from here.  And you will have an

8    opportunity to review it.

9         This was an individual who was reporting back about

10   all the terrible things that had happened to her after taking

11   MMS, ranging from vomiting, diarrhea, stripping the enamel off

12   her teeth, biofilms suddenly appearing on her skin.  And she

13   says, Wait a second.  Are you sure this is the right thing I'm

14   taking, that it is yellow -- I'll have to actually look closer

15   at the description -- dark yellow, amber color, stinks and

16   tastes like bleach?  And what was the response from the

17   Defendants in their e-mail?  Yes, that is a correct description

18   of the MMS.  Again, not our words, not the FDA's words, not a

19   court's words, these are the words of the Defendants.  This is

20   a toxic bleach.

21        What do the Defendants promote this to cure?  Up to 95

22   percent of the world 's diseases.  You've see a bunch of

23   examples of that in the evidence, and Agent Rivera talked about

24   more.  Government's Exhibit 3, one of the informercial

25   podcasts, that was Mark Grenon talking about how Miracle

Case 1:21-cr-20242-CMA   Document 299   Entered on FLSD Docket 01/18/2024   Page 68 of 93
Closing Argument on Behalf of the Government
July 19, 2023                                    68
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1    Mineral Solution cured cancer.  That's the same video, if I
2    remember correctly, where we have the true infomercial segment
3    with Sandy from Michigan who appears and, as Mark Grenon
4    describes it, have reported having hairballs of cancer coming
5    out of her after she inhaled the Miracle Mineral Solution.
6           So we know they promoted it to cure cancer.  We also
7    know that they promoted it to cure coronavirus, even to the
8    point -- and this is another exhibit.  This is from early 2020
9    when there is all kinds of confusion and uncertainly about what
10   coronavirus was and how deadly it was.  They are even telling
11   you to dose it to small children, strong days -- strong dosing
12   for the first two days, because, as they said, this will wipe
13   out this flew-like virus.  So give your kids small strong doses
14   of Miracle Mineral Solution.  It will make the coronavirus go
15   away.  Lots of other diseases you heard about as well.
16          Folks, this was no miracle.  What this was is best
17   illustrated, I think, by those green jugs that the agents found
18   when they executed the search warrant at the time Jonathan and
19   Jordan were arrested up in Bradenton.  Remember the labels on
20   this?  These are the drugs that contain sodium chloride, that's
21   the main, active ingredient in Miracle Mineral Solution.
22   Harmful if swallowed.  Call poison control.  Used for industry,
23   flammable.  This is what the Defendants sold to people to put
24   in their bodies to cure the most serious of human diseases.
25          This was no miracle.  What did the Defendants know

1    about what this product actually did?  We have the e-mails.  As

2    Agent Rivera testified, FDA obtained a search warrant for a

3    judge to go through the Defendants' e-mails and found these

4    messages, which you otherwise wouldn't have known about, where

5    individuals who took this stuff complained to Defendants and

6    said, My gosh, this has made me sick.  Far from curing

7    anything, it's made me ill.  You can review all those e-mails

8    when you go back.  Vomiting, screaming, shaking, dropped blood

9    pressure, hospitalization.

10            And, of course, as you heard earlier this afternoon

11   from Dr. Simone, it is not just a question of what this product

12   did to people, it's that people took this and the Defendants

13   wanted people to take this instead of actually getting cures

14   that could have made them better, could have made them

15   healthier.

16            So on every level, this was a dangerous product.  Now

17   remember, in the jury instructions that the Chief Judge just

18   read to you, there is no requirement that the Government prove

19   that this is a dangerous product, but we brought you that

20   evidence, ladies and gentlemen.

21            All of this comes to a head in March of 2020.  The

22   coronavirus arrives in the United States, there is tremendous

23   uncertainty, and what do these Defendants do?  That is another

24   chance to cash in even more.  You heard testimony that leading

25   up to this, based on a review of the e-mails, they were taking

```
 1    in maybe $30,000 a month; suddenly that skyrockets to $120,000,
 2    right when the coronavirus breaks.  We all remember that.
 3    There was a great deal of uncertainty.  People were picking up
 4    this product thinking it would cure the coronavirus, because
 5    that's what the Defendants said.
 6            At that point, the FDA obtains from a federal judge,
 7    who sits in this same building as Chief Judge Altonaga, Judge
 8    Williams, a temporary restraining order and then what's called
 9    a preliminary injunction.  Court order saying enough, stop
10    holding this stuff, stop selling this stuff, stop distributing
11    this stuff.  Enough.
12            What do the Defendants say? -- again, you have their
13    own words in evidence -- We don't care.  We are going do
14    violate it.  And we proved that they did, in fact, violate both
15    of those court orders.
16            That's the summary, ladies and gentlemen, of the
17    evidence that we have brought you in this case.  Chief Judge
18    Altonaga just instructed you about the law that you need to
19    apply and about the standard of reasonable doubt.  I know some
20    of you have sat on juries before, and let's face it, some
21    things about this trial may have seemed different.
22            But what we are asking you do is the same task that
23    every criminal jury in the United States is asked to do.  Take
24    a look at the evidence, review the jury instructions that you
25    have taken an oath to follow, apply a standard of beyond a
```

Case 1:21-cr-20242-CMA Document 299 Entered on FLSD Docket 01/18/2024 Page 71 of 93

71

Closing Argument on behalf of the Government
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1  reasonable doubt and return a verdict of guilty.  Nothing

2  different about that.

3        And in the definition of reasonable doubt that the

4  Judge shared with you, there is important language about common

5  sense.  You don't leave that aside when you come into this

6  courtroom.  You consider the evidence and you follow the law,

7  but you also bring your own life experiences, your own good

8  judgment and your common sense.

9        I suggest to you that the evidence in this case and

10 your common sense lead directly to the conclusion that the cure

11 for cancer, the cure for AIDS, the cure for autism was not

12 being made in a poop-infested shed in a backyard in Bradenton.

13       So let me talk to you about the charges and do my best

14 to guide you through what we are asking you to find in this

15 case.  I know the instructions are long, but I suggest to you

16 the concepts are fairly simple.

17       There are three charges:  Count 1 is the criminal

18 conspiracy, Count 2 is criminal contempt against Jonathan and

19 Jordan Grenon for violating the first of Judge Williams' order,

20 the TRO, and Count 3 is contempt for violating the preliminary

21 injunction.

22       Let's talk about Count 1, the criminal conspiracy.

23 What's a conspiracy?  We are all familiar with it as a general

24 concept.  There is a specific legal definition.  It is

25 basically an agreement between two or more people to accomplish

1    some kind of unlawful plan.

2            We have to prove that.  We have to prove the

3    Defendants joined that plan knowingly and willfully.  Knowingly

4    basically means it is not by accident, they knew what they were

5    doing.  And willfully means you have a general bad purpose to

6    disobey the law.  I suggest to you there's overwhelming

7    evidence that's what the Defendants did in this case.  There is

8    no requirement that they know the specification law that they

9    are violating.

10           And finally, the last thing we have to show is that at

11   least one of the conspirators committed what is called an overt

12   act.  That simply means they did something to move this plan

13   out of their heads into action.  In fact, ladies and gentlemen,

14   we have proved to you that they fully committed all of these

15   crimes, but that is not a requirement for a conspiracy.

16           Okay.  Let me talk about each of those a little bit

17   more specifically.  Two or more people agree to a plan.  We

18   know the Defendants are all family.  Mark Grenon, the father,

19   and the three sons.  We know from the evidence they jointly

20   formed this fake Genesis II Church declaring themselves an

21   archbishop and a bishop of the church.  Your archbishop and all

22   three bishops right there in this courtroom.

23           They jointly manufactured, promoted and distributed

24   and sold MMS.  They jointly maintained the website.  They

25   communicated with each other by e-mail, the e-mails you saw

Case 1:21-cr-20242-CMA Document 299 Entered on FLSD Docket 01/18/2024 Page 73 of 93
Closing Arguments on behalf of the Government
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA
73

1    earlier with Agent Rivera.  And you can view them back in the

2    jury room.  They appeared in the infomercials together.  And of

3    course, after the Court, Judge Williams, issued an order, they

4    jointly signed letters to the Court saying, We don't care,

5    we're not complying.

6          May be helpful to also think about the roles of the

7    Defendants.  Everybody did a little bit of everything, but

8    primarily we've proved that Mark was the leader, the

9    archbishop, and he was the host of these infomercials, the man

10   who did most of the talking.

11         Joseph appeared on those infomercials, along with his

12   father.

13         Jordan Grenon, responsibile for the customer service,

14   the e-mails, responded to the different complaints about how

15   damaging this product was to individuals.

16         And of course, we have Jonathan Grenon, primarily

17   responsible for manufacturing and distributing this stuff from

18   the backyard shed in Bradenton.

19         So what was this plan?  And this is where we get to

20   that concept that Chief Judge Altonaga talked about, about

21   objects of the conspiracy.  Basically, what were they coming to

22   do?  What laws did that illegal plan they came up with violate?

23   In this case, there are three:  One is to defraud the United

24   States, one is to distribute an unapproved new drug and the

25   third is to distribute a misbranded drug.

Closing Argument on behalf of the Government
July 19, 2023
74
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1        We have proved all three of those objects in this

2  conspiracy beyond a reasonable doubt, but as the Chief Judge

3  told you, you only need to agree just on one of those.

4        So let's talk about the first, defrauding the FDA.

5  What does that mean?  It means two things, basically.  The

6  Defendant's plan to interfere with the FDA's ability to do its

7  job.  You heard testimony earlier today from Dr. Simone.  You

8  heard similar testimony from Agent Rivera, that it's the FDA's

9  job to ensure sure that the drugs that enter interstate

10  commerce, in the marketplace where they have access to all of

11  us, are safe and effective for their intended uses and the

12  drugs that don't meet that criteria can't be obtained by

13  people.  That's the lawful function, the responsibility of the

14  FDA given to it by Congress.

15        The Defendants' entire plan was to go around them.

16  There are no approvals, there are no registrations, nothing at

17  all.  They knew they were selling an unapproved drug, an

18  unregistered drug and they wanted to make it harder for the FDA

19  and the Government to stop them.

20        Second part of it is, did that plan rely on deceit,

21  craft or trickery?  That's the language from the jury

22  instructions.  Were they playing tricks?  Were they playing

23  games?  Were they dishonest?

24        Ladies and gentlemen, a fake church -that even the

25  Defendants themselves -- was a nonreligious church created for

1    one purpose, this purpose, to make it harder, they thought, for

2    the FDA and the Government and the courts to stop them from

3    selling this snake oil.  Online church of bleach.

4            Remember these exhibits that we showed to you.

5    Government's Exhibit 27, that was the church's card that was

6    included in the shipment of MMS that went out to purchaser.

7    Looks genuine enough.  Of course, on the right, that's the

8    church.  There it is with those jugs of sodium chloride with

9    the HAZMAT warnings on them and the animal poop on the floor.

10   No services, no sanctuary, no hymns, no creed, nothing.

11   Whatever your religious background may be, your religious

12   experience may be, this is no church.  No religion.  This was

13   created simply to mislead and interfere with the FDA and the

14   Government's ability to do their jobs.

15           Of course, that is not the only example that we have.

16   We have the Defendants calling this drug, as agent -- as

17   Dr. Simone explained to you, a sacrament.  It doesn't matter.

18   They call sales prices on their website donations.  These

19   weren't donations that any of you who go to a house of worship

20   of some kind think of charity in whatever amount you want,

21   these were fixed amounts.  No different than if you go on

22   Amazon or any other online shopping website to buy a product.

23           And finally, even after Judge Williams issued that

24   temporary restraining order, you remember the video, it's

25   Government's Exhibit 60, with Jonathan Grenon talking about how

they had started putting in a questionnaire to weed out the people, his words, not mine, trying to cause us trouble.  Which came for the first time after that TRO.

Did that video make any mention of why that was suddenly being put in?  No, of course not.  The reality was a court had told them, Enough, you can't do this.  Deception and trickery and deceit and dishonesty at every turn.  So that's the first object of the conspiracy.

What's the second one?  Distributing an unapproved new drug.  You heard the testimony about that earlier this afternoon, and it is an unapproved new drug because it is intended to treat or cure diseases of man.  Doesn't matter what the Defendants called it or wanted to call it.

Second requirement, that it be introduce into interstate commerce.  That's basically the market -- marketplace between different states such that you and I could buy it anywhere we wanted in the United States.

And third, the Defendants acted with intent to mislead the FDA.  Let me just talk briefly about each of these.

A laundry list of diseases:  Cancer, breast cancer, lung, every cancer, Alzheimer's, AIDS, autism, diabetes, COVID, you go on down the list, I bet you can't think of one or can't find one in the evidence that this one product could not magically cure, according to the Defendants.  So we have that.

And you also know that MMS wasn't just consumed by

Case 1:21-cr-20242-CMA  Document 299  Entered on FLSD Docket 01/18/2024  Page 77 of 93
77
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1  these Defendants in that backyard shed.  It was shipped all

2  over the United States, from Bradenton, Florida, where you saw

3  the evidence about what the agents found after the search

4  warrant at the time of arrest, to all of these different

5  locations throughout the United States, including the Southern

6  District of Florida.

7          You heard testimony that there were actually shipments

8  made here and throughout the United States, Colorado,

9  Washington state, Hawaii.  Don't forgot we have Mark Grenon and

10  Joseph Grenon down in Colombia at the Health Restoration Center

11  where for a mere $5,000, I imagine you could take as much MMS

12  as you possibly want.

13          What's our proof, then, of that the intent element,

14  intent to mislead?  As Chief Judge Altonaga told you, it is

15  about creating a false impression to use means that are

16  dishonest.  Again, ladies and gentlemen, there is overwhelming

17  evidence that that is, in fact, why they created this whole

18  fake nonreligious church.

19          So when I mentioned earlier the jury instructions seem

20  long, the concepts sort of overlap.  We are asking you to

21  consider the same proof on these issues of intent to mislead

22  and willfulness, it all comes back to the same thing:  The idea

23  of dishonesty and the things that these Defendants did to

24  deceive and mislead the FDA regulators and ultimately the

25  courts.

Case 1:21-cr-20242-CMA   Document 299   Entered on FLSD Docket 01/18/2024   Page 78 of 93
78
Closing Arguments on Behalf of the Government
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

 1          But you have the option also as well in the jury

 2    instructions of finding that we proved this charge because the

 3    Defendants intended to defraud and mislead customers.  You saw

 4    those e-mails about people who found out that far from curing

 5    their diseases which they thought, they were actually made more

 6    sick.  You also saw evidence about conditions at that Bradenton

 7    backyard church.  None of that was ever disclosed to consumers

 8    of this product.

 9          So you have a lot of ways to get to the same

10    conclusion.  Even if you don't believe the people who bought

11    this stuff was misled about what it would do, unquestionably

12    there is evidence beyond a reasonable doubt that the Defendants

13    intended to mislead the FDA and the Government and, again,

14    later the courts about who they were and what they were about.

15          Okay.  Third object of that conspiracy in Count 1,

16    distributing a misbranded drug.  Testimony from Dr. Simone this

17    afternoon was straightforward.  Miracle Mineral Solution is a

18    misbranded drug for at least two reasons.  It's made in an

19    unregistered establishment.  You heard there were no

20    applications to register this address or any of the people

21    associated with this product.  And also, that it lacks adequate

22    directions for use by a layperson.  Basically meaning you can't

23    put out a product intending to cure or treat cancer when you

24    are at the same time saying, Stay away from doctors.

25          Okay.  These are diseases that need a physician to

Case 1:21-cr-20242-CMA Document 299 Entered on FLSD Docket 01/18/2024 Page 79 of 93
Closing Arguments on Behalf of the Government
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA
79

1  diagnosis them properly, determine what you need.  This isn't a

2  joke.  These are the most serious diseases all of us could face

3  in our lives, and they are saying that that sodium chloride

4  solution is going to cure it.  No directions.  No protocol.  No

5  take one drop an hour, two drops an hour and make that

6  permissible.

7         So we know this is a misbranded drug, and as for the

8  intended requirement, it's that same concept:  Were they

9  intending to dishonest?  Were they misleading?  Were they

10  acting to disregard the law?  Straight forward.

11         Dr. Simone talked earlier today about why it is

12  important that places that manufactured drugs register.  You

13  remember these images.  You have the contaminated MMS that the

14  agents found when they executed the search warrant and the poop

15  on the floor of the shed where this supposedly life-curing

16  miracle was made.

17         The FDA exists to make sure that drugs are safe and

18  effective and that contaminates don't enter things that people

19  put in their body.

20         All right.  So to summarize, Count 1 of criminal

21  conspiracy, the Defendants joined together in an unlawful plan

22  to sell this Miracle Mineral Solution to a fake nonreligious

23  church.  The plan had three illegal objects.  Each defendant

24  joined that plan knowing that it was illegal and intending to

25  mislead and they put the plan into action.

Case 1:21-cr-20242-CMA  Document 299  Entered on FLSD Docket 01/18/2024  Page 80 of 93
80
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1      Okay.  The contempt charges, Count 2 and 3, even more

2  straightforward.  Chief Judge Altonaga read you the jury

3  instruction, basically, about knowingly and intentionally

4  violating the court order.  You get an order from a federal

5  judge that you don't like, there are things that you can do

6  about it.  You can appeal.  There are all kinds of ways you can

7  try to dispute that.  But what you can't do, and that applies

8  to us as lawyers in Chief Judge Altonaga's courtroom, it

9  applies to people who are the subject of those orders, is

10  violate it because you don't like it, or in the Defendants' own

11  words, you don't care.

12      And that's exactly what Defendant Jonathan Grenon and

13  Jordan Grenon, the two Defendants charged in this count, did.

14  They were told not to hold, not to distribute, not to label

15  Miracle Mineral Solution.  There is no exception in that order,

16  as you will see, for freely gifting it, which is what, at one

17  point after the order, the Defendants tried to do.  That's

18  completely made up.  You're not going to see it.  There's no

19  exception.

20      So Count 2 is about the TRO issued in April of 2020.

21  We know for a fact that Defendants continued at least to hold

22  the MMS.  The search that was executed at the time of arrest a

23  few weeks later found a year's supply of sodium chloride and

24  MMS in bottles.  So we know at minimum, they continued to hold

25  it.

Closing Arguments on Behalf of the Government
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1    But if we had any confusion at all, again, we have the

2    Defendants' own words.  Genesis II Church, not bound to obey

3    the TRO.  Made it plain as day.  Mark Grenon speaking on behalf

4    of the Defendants and the church, We won't comply with a TRO.

5    We are violating a TRO.  We don't care.  And then even to the

6    point of threatening the Second Amendment if anybody tried to

7    take the next step from stopping them distributing this

8    product.

9    Count 3 is the preliminary injunction that was issued

10   on May 1st, 2020.  We have overwhelming evidence yet again.  We

11   have proof of the undercover shipment that was made in July

12   2020 by Jonathan and Jordan from Bradenton, so direct proof.

13   If you have nothing else, we know that that was a violation as

14   Agent Rivera testified to.  Of course, again, we have the

15   Defendants' own words.  Jordan's post, We are giving this

16   product away.  We have the video promoting the free gifting,

17   listing Jordan as the contact for those who wanted to make a

18   donation forward to support their project.  And of course

19   Jonathan's video, which is Government Exhibit 63, saying

20   directly, Over a hundred gifts have been given away since we

21   started this weeks ago.  This is obviously now two months after

22   the preliminary injunction had been issued, so pretty stark

23   admission.

24   So that's the evidence on the contempt charges in

25   Counts 2 and 3.  Now, in those instructions, the law you have

closing argument on behalf of the government
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1   to consider, there is no requirement that we prove to you that

2   the Defendants acted for profit, that they got rich.  You could

3   believe that Defendants just thought they were above the law

4   and they responded to a higher God, but I suggest to you, make

5   no mistake when you think about this and try and make sense

6   what went on here, this is a scam for money, an old fashioned

7   scam.

8           Remember all that cash the agents found?  Just on that

9   one day, the day of arrest, $40,000 in 100s and 50s, not

10  counting the gold coins they also found.

11          We talked earlier about how the whole website was set

12  up, how you had to make specific donations in order to purchase

13  products.  This looks no different than any of the online

14  shopping sites any of you may have visited during your breaks

15  here or back at home or I may go look at tonight.

16          And then, of course, even from the start of their web

17  page, the whole concept of filling your shopping cart, this is

18  supposedly the cure for cancer, for AIDS, for Alzheimer's

19  disease, and what is on that website?  First entry:  New MMS

20  book.  Imagine a world without disease.  Buy now.  Each one of

21  these entries got that little shopping cart right there.  Give

22  us your money.  Show us the money.  Mark Grenon's books, The

23  Sacramental Providers.  Jim Humble's books, more sacramental

24  providers.  Sacramental guidance, church membership, all with a

25  shopping cart.  All available as long as you send them money.

Closing Arguments on behalf of the Government
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1    This was an old fashion scam for money, ladies and gentlemen.

2             Yet, if you have any doubt about what went on here and

3    its illegality, remember this e-mail.  This was Government

4    Exhibit 45.  This was an individual who wrote back and said,

5    This product is dangerous.  I can't give this to a family

6    member.  I can't take it myself.  I bought it in good faith.

7    Please give me my money back.  This gets e-mailed to the

8    Defendants, it gets forwarded on to the whole family, including

9    e-mail address Archie, which I believe would be the Archbishop

10   Mark Grenon.  And what is the response, ladies and gentlemen?

11   Liars, don't believe them.  We will not take it back to return

12   any money.  Why are we taking it back and then return their

13   money?  That's stupid.  Don't get used to that.

14           This is in response to an e-mail where somebody said

15   their family member was -- their lives were put in jeopardy by

16   taking this product.

17           Ladies and gentlemen, this was a scam for money.

18           When you go back now, I want you to take a look at the

19   evidence that we have presented to you in this case, consider

20   the jury instructions.  And you will be given a verdict form

21   and that's where you mark down what your decision is ultimately

22   on each of these charges.

23           And I suggest to you that as to Count 1 of the

24   indictment, we have proven that charge, that criminal

25   conspiracy beyond a reasonable doubt.  That's a check mark next

1    to guilty.  We have proven all three objects of that criminal

2    plan, all three things that that plan violated.  And I ask you

3    to put the check mark next to each of those.

4          And then I ask you to put a check mark next to Count 2

5    and Count 3 of the indictment as to Jonathan Grenon and Jordan

6    Grenon on those criminal contempt charges.  The evidence on all

7    of these charges is not just beyond a reasonable doubt, but is

8    overwhelming.

9          Let me leave you with this:  Some of you may drink

10   wine, some of you may not, but either way, the evidence and

11   your common sense tell you that the cure for cancer, the cure

12   for Alzheimer's, the cure for a child's autism is not found at

13   the bottom of a wine glass to be sniffed and swirled and

14   sipped.  Certainly not when what is going into that wine glass

15   is an industrial bleach so powerful that, as Agent Rivera said,

16   this label bleached itself.  You will see the bottles back

17   there with the bright green label and take a look at this.

18         Ladies and gentlemen, the Defendants knew what they

19   were doing was illegal.  They knew it had to be dishonest about

20   how they were going to continue to sell and market and

21   distribute this product to try and interfere with the ability

22   of the Government, the FDA, regulators and ultimately Judge

23   Williams' orders, the orders of the Court here in this

24   building.

25         I submit to you, ladies and gentlemen, there is only

closing argument on behalf of the Government
July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1    one verdict that is consistent with the evidence in this case

2    and that is a verdict of guilty.

3          I thank you for your time and ask you to return a

4    verdict of guilty on all counts in all charges in this case.

5    Thank you very much.

6          Thank you, Judge.

7          THE COURT:  Would the Defendants like to make any

8    closing statements?

9          (No audible response.)

10          THE COURT:  I'm hearing no response.

11          All right.  Ladies and gentlemen, you will all have,

12    as I said before, these instructions that we read together with

13    you when you deliberate.  There is one verdict form and a copy

14    of the indictment that will also go back with you.  All of the

15    exhibits in evidence will be there as well with a laptop for

16    the jury to view, as you like, the exhibits.

17          We have two of your members who have been with us as

18    alternates, and they will be excused at this time; they will

19    not participate in the deliberation phase.  And those are

20    jurors ▮▮▮▮▮ and ▮▮▮▮▮.  So I would ask those ladies just to

21    wait briefly for my courtroom deputy to pass out some forms you

22    may need to show your employers to show them that you were here

23    with us.  But the rest of the jury will then deliberate.

24          I had indicated our schedule for today was from 2 to

25    6.  If we have not heard back from you by 6 p.m., we will be

1   knocking on the door and we will be releasing you for the

2   evening with instructions to return tomorrow morning at 9.  If

3   those are the instructions that you receive, please leave

4   everything in the jury room, notebooks and exhibits in the jury

5   room as you leave for the evening.  And please don't discuss

6   this case or do any reading or research about it until you

7   return tomorrow morning at 9.  Again, that's if we don't hear

8   from you by 6 o'clock.  Thank you.

9            THE COURTROOM DEPUTY:  All rise.

10       (Jury exited the courtroom at 4:20 p.m. for deliberations.)

11           THE COURT:  Are all of the exhibits ready?

12           MR. HOMER:  Yes, Your Honor.  We have the physical

13  exhibits ready in the box.  All of the digital exhibits have

14  been copied onto a clean jury laptop; they're in a folder on

15  the desktop called "exhibits."  There is no password needed.

16  Everything is ready to go.

17           THE COURT:  Very good.  Did the Grenons want to look

18  at those exhibits before they go back to the jury?

19           (No audible response.)

20           THE COURT:  I'm getting no response.  All right.

21           MR. HOMER:  I was going to ask, Your Honor, to ask the

22  same thing, but you are one step ahead of me, so we are all

23  set, Your Honor.

24           THE COURT:  Very good.  Thank you.

25           MR. HOMER:  Thank you.

1          THE COURT:  We're in recess.

2      (A recess was taken from 4:22 p.m. to 4:53 p.m. for

3       deliberations.)

4          THE COURT:  All right.  Everyone is back.  The jury

5  has a verdict.

6          Patricia, make sure these are all signed.

7          Let's bring the jury out, please.

8          COURT SECURITY OFFICER:  All rise for the jury.

9      (The jury entered the courtroom at 4:54 p.m.)

10          THE COURT:  Everyone, please be seated.

11          It is my understanding that the jury has reached a

12  verdict.  I would ask the foreperson to hand my courtroom

13  deputy the verdict form, please.

14      (Pause in proceedings.)

15                          VERDICT

16          THE COURT:  There are no errors or omissions in the

17  filling out of the verdict form.  I will publish the verdict at

18  this time.

19          In the case of United States vs. Mark Scott Grenon,

20  Jonathan David Grenon, Jordan Paul Grenon and Joseph Timothy

21  Grenon, we, the jury, unanimously find as follows:

22          For Defendant Mark Scott Grenon as to Count 1 of the

23  indictment, guilty.  If guilty, identify whether the Government

24  proved the following objects:  To defraud the United States and

25  its agencies, yes.  To commit the offense of distributing an

1  unapproved new drug, yes.  To commit the offense of

2  distributing a misbranded drug, yes.

3          For Defendant Jonathan David Grenon as to Count 1 of

4  the indictment, guilty.  If guilty, identify whether the

5  Government proved the following objects:  To defraud the United

6  States and its agencies, yes.  To commit the offense of

7  distributing an unapproved new drug, yes.  To commit the

8  offense of distributing a misbranded drug, yes.

9          As to Count2 of the indictment, guilty.

10          As to Count 3 of the indictment, guilty.

11          For Defendant Jordan Paul Grenon as to Count 1 of the

12  indictment, guilty.  If guilty, identify whether the Government

13  proved the following objects:  To defraud the United States and

14  its agencies, yes.  To commit the offense of distributing an

15  unapproved new drug, yes.  To commit the offense of

16  distributing a misbranded drug, yes.

17          As to Count 2 of the indictment, guilty.

18          As to Count 3 of the indictment, guilty.

19          For Defendant Joseph Timothy Grenon as to Count 1 of

20  the indictment, guilty.  If guilty, please identify whether the

21  Government proved the following objects:  To defraud the United

22  States and its agencies, yes.  To commit the offense of

23  distributing an unapproved new drug, yes.  To commit the

24  offense of distributing a misbranded drug, yes.

25          Signed on today's date by the jury foreperson.

July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1          Do counsel for either the Government or the Defendants

2    desire the jury to be polled?

3          MR. HOMER:  Yes, Your Honor.

4          THE COURT:  Ladies and gentlemen, my courtroom deputy

5    will now ask each of you individually if this is your verdict;

6    please answer out loud.

7          THE COURTROOM DEPUTY:  Juror No. 1, ██████, is this your

8    verdict?

9          THE JUROR:  Yes.

10          THE COURTROOM DEPUTY:  Juror No. 2, ███████, is this

11    your verdict?

12          THE JUROR:  Yes.

13          THE COURTROOM DEPUTY:  Juror No. 3, ███████, is this

14    your verdict?

15          THE JUROR:  Yes.

16          THE COURTROOM DEPUTY:  Juror No. 4, ███████, is this

17    your verdict?

18          THE JUROR:  Yes.

19          THE COURTROOM DEPUTY:  Juror No. 5, ███████, is this

20    your verdict?

21          THE JUROR:  Yes.

22          THE COURTROOM DEPUTY:  Juror No. 6, █████, is this

23    your verdict?

24          THE JUROR:  Yes.

25          THE COURTROOM DEPUTY:  Juror No. 7, ███████, is this

July 19, 2023
USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1    your verdict?

 2            THE JUROR:  Yes.

 3            THE COURTROOM DEPUTY:  Juror No. 8, ███████, is this

 4    your verdict?

 5            THE JUROR:  Yes.

 6            THE COURTROOM DEPUTY:  Juror No. 9, ██████, is this

 7    your verdict?

 8            THE JUROR:  Yes.

 9            THE COURTROOM DEPUTY:  Juror No. 10, ███████, is this

10    your verdict?

11            THE JUROR:  Yes.

12            THE COURTROOM DEPUTY:  Juror No. 11, █████, is this

13    your verdict?

14            THE JUROR:  Yes.

15            THE COURTROOM DEPUTY:  Juror No. 12, ███████, is this

16    your verdict?

17            THE JUROR:  Yes.

18            THE COURTROOM DEPUTY:  They all answered affirmatively,

19    Your Honor.

20            THE COURT:  Thank you.

21            Ladies and gentlemen, I wish to thank you for your

22    time and the careful consideration you have given this case.  I

23    also wish to advise you of some special privileges enjoyed by

24    jurors.  For hundreds of years our society has relied upon

25    juries for the consideration of difficult cases and we have
```

91

1   recognized that a jury's deliberations, discussions and votes

2   should remain its private affair for as long as the jury

3   wishes.

4           You are certainly at liberty to speak to anyone about

5   this case.  You remain at liberty to refuse to speak in anyone.

6   I will add that the parties in this case cannot contact you or

7   communicate with you about the case.

8           My courtroom deputy will follow you into the jury room

9   one last time.  She is going to give out some forms from our

10  jury poll section showing the dates that you have been with us.

11  She will also pass out some certificates that I have signed

12  thanking you more formally for your jury service.  She will

13  gather the notes and the materials that are in there and take

14  care of them.

15          And you are excused.  I think you are still on jury

16  service for the next week or so, but I doubt that you will be

17  called, but I can't make any guarantees.  Thank you very much,

18  and you all have a good day.

19          THE COURTROOM DEPUTY:  All rise.

20      (The jury exited the courtroom at 4:59 p.m.)

21          THE COURT:  To the defendants, Mark, Jonathan, Jordan

22  and Joseph Grenon, I do now adjudge you guilty of Count 1 of

23  the indictment.

24          To the Defendants Jonathan and Jordan Grenon, I

25  adjudge you guilty of Counts 2 and 3 of the indictment as well.

July 19, 2023

USA v. Mark Scott Grenon, et al., 21-cr-20242-CMA

1    You gentlemen will return to court for your sentencing

2  hearing on Friday, October 6th.  Mark Grenon at 9:00, Jonathan

3  Grenon at 9:30, Jordan at 10:00 and Joseph Grenon at 10:30.

4    Is there anything additional?  From Joseph Grenon.

5    DEFENDANT JOSEPH:  We will be appealing.

6    THE COURT:  All right.  Anything else?

7    All right.  You all have a good day.

8    MR. HOMER:  Thank you, Your Honor.

9    THE COURT:  Please just wait for the exhibits.

10    To Mr. Wylie and Mr. Donnelly, thank you very much for

11  being here.

12    MR. DONNELLY:  Just a question, we are staying on for

13  sentencing, right?

14    THE COURT:  Yes.

15    MR. DONNELLY:  Will we get access to appeals, or no?

16    THE COURT:  Yes, certainly.

17    MR. WYLIE:  Thank you.

18    MR. SHIPLEY:  Your Honor, one -- just a scheduling,

19  Mr. Homer is more than capable of handling the sentencing.  I

20  am actually out of the country that week.  Can we pick a

21  different date in October, something that may work for your

22  calendar, or we can raise it with you later, but I know I'm

23  gone then.

24    THE COURT:  Are you back the following week?

25    MR. SHIPLEY:  Back on the 10th, so after.

Case 1:21-cr-20242-CMA  Document 299  Entered on FLSD Docket 01/18/2024  Page 93 of 93
93
Court Reported Proceedings
July 19, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    THE COURT:  The 10th on Tuesday.  I start a two-month

2   long trial on Tuesday the 10th, but I could certainly fit the

3   sentencings in.  What I would not do is, I would not do them

4   all on the same day in that case.  I would do them over -- I'd

5   spread them over two days so as not to take time from the jury.

6    MR. HOMER:  Your Honor, we will stick with the 6th

7   then.  I think it will just make more sense for everybody to do

8   it all at the same time.

9    THE COURT:  Keep it all the same.  Okay.  Thank you.

10   (The proceedings adjourned at 5:02 p.m.)

11

12

    **C E R T I F I C A T E**

13

14    I hereby certify that the foregoing is an

15   accurate transcription of the proceedings in the

16   above-entitled matter.

17

18   _01/14/2024_ _____

19    DATE        STEPHANIE A. McCARN, RPR
             Official United States Court Reporter
20           400 North Miami Avenue, Thirteenth Floor
             Miami, Florida 33128
21           (305) 523-5518

22

23

24

25